IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

        *Plaintiffs*,

      v.

MICHAEL S. REGAN, *et al.*,

        *Defendants*.

Civil Action No. 21-119 (RDM)

**FLORIDA INTERVENORS' MOTION FOR LIMITED STAY
OF FEBRUARY 15, 2024 VACATUR ORDER**

## I.    Introduction

On February 15, 2024, this Court vacated the Environmental Protection Agency's (EPA's) approval of Florida's Section 404 program assumption application while allowing Defendants to "seek a limited stay of that vacatur within ten days[1] of this decision." Dkt. 163 at 96; Dkt. 164 at 1-2. As anticipated, vacatur of Florida's program has already begun to create enormously disruptive consequences and raise complex problems for the State and thousands of Floridians to navigate. While Florida continues to administer its state wetlands permitting program (the "ERP" program) for *all waters and wetlands in the State*, substantial confusion now exists over the ability of applicants with pending or forthcoming applications to obtain necessary Section 404 permits in assumable "waters of the United States." Well over 1,000 pending 404 individual and general permit applications – the vast majority of which have been in the Florida 404 permit review process

_____

[1] The order was entered at 11:42 p.m. EDT on the night of February 15, 2024. The tenth day would fall, at the earliest, on Monday, February 26, 2024, pursuant to Fed. Rule of Civ. Proc. 6(a).

for more than six months (with many far along toward a final decision) – are now in regulatory limbo with no clear timeline or expectation for a permit decision. This includes pending permit applications for roads and bridges, hospital construction projects, school buildings and facilities, affordable housing, military base projects, power grid reliability projects (including construction of new power generation facilities and transmission lines), and various projects necessary to improve water quality in the Everglades, just to name a handful of examples. *See* Wolfe Decl. ¶¶ 8-10 (Exhibit A).

The State of Florida and FDEP (collectively, Florida Intervenors) remain committed to administering the Section 404 program for all assumable waters in a manner consistent with the law. To that end, Florida Intervenors intend to move forward on efforts to ensure that FDEP continues to implement the program to the fullest extent. While those details will take additional time to sort out, Florida Intervenors respectfully move for a limited stay based on a "may affect" concept referenced by this Court. Florida Intervenors agree that a limited stay will help to minimize some of the disruptive consequences arising from vacatur. In this Motion, Florida Intervenors present a workable interim solution, while also flagging several issues that, with clarification from this Court as part of a limited stay, will further help to minimize disruptions that go beyond the specific concerns underlying this Court's February 15 ruling.

While Florida Intervenors have endeavored to present a limited stay approach that is responsive to the Court's invitation and conditions, "partial assumption" concerns associated with a pure "may affect" approach (as raised by Federal Defendants) would, as explained in more detail at the end of this Motion, countenance in favor of simply using the New Jersey/Michigan model

for purposes of a limited stay.[2] A proposed Order for a limited stay based on either approach is filed with this Motion.

## II.     Standard of Review

In this Circuit, district courts have discretion to grant a limited stay as to implementation of a judicial vacatur order, either as part of its inherent discretion to modify its own remedy orders, *AARP v. Equal Emp. Opportunity Comm'n*, 292 F. Supp. 3d 238, 245 (D.D.C. 2017), or based on the *Allied-Signal* factors, *Chamber of Com. v. SEC,* 443 F.3d 890, 909 (D.C. Cir. 2006). Both avenues provide strong support for granting a limited stay here. *Cook Inlet Tribal Council v. Mandregan*, No. 14-CV-1835 (EGS), 2019 WL 3816573, at *4 (D.D.C. Aug. 14, 2019); *AARP*, 292 F. Supp. 3d at 245 ("the Court will exercise its discretion to stay the effective date of its vacatur order until January 1, 2019"). Under the *Allied-Signal* factors, a court weighing the remedy to address an agency error must consider (1) the "seriousness of the order's deficiencies" and (2) the likely "disruptive consequences" of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted).

## III.    Limited Stay Is Necessary to Minimize Highly Disruptive Consequences of Vacatur[3]

While this Court's inherent discretion over enforcement of its own orders provides ample basis for a stay of its vacatur order, the *Allied-Signal* factors confirm that a limited stay, at a

---

[2] In New Jersey, EPA does not "federalize those [state 404] applications likely to adversely affect listed species." *Cf.* Dkt. 163 at 5, 23 (equating "federalize" with "pass to the FWS and NMFS for review"). Instead, those applications are forwarded to FWS for purposes of "federal review" under 40 C.F.R. Part 233, just as occurs in Florida. *See infra* at 15-18. For species review purposes, federalizing occurs where (1) a New Jersey state 404 permit would jeopardize the continued existence of listed species and/or adversely modify designated critical habitat *and* (2) New Jersey refuses to deny the permit or fails to adopt the measures deemed necessary to avoid jeopardy. *Id.* Failing to adopt federal conditions to "avoid or minimize" incidental take is also a basis for an objection in New Jersey.

[3] While seeking a limited stay here, Florida Intervenors expressly reserve the right to seek a full stay of the order and/or stay of the District Court proceedings at a later time. Moreover, as

minimum, is appropriate. *Bauer v. DeVos*, 332 F. Supp. 3d 181, 185 (D.D.C. 2018) (Moss, J.) ("Vacatur with a brief stay may be warranted, for example, where the *Allied-Signal* factors are satisfied, but where a prolonged agency remand threatens to deprive one or more parties of significant rights."); *Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006) (remand with instructions to vacate EPA's approvals but recognizing that "the district court retains some remedial discretion, however, and the parties may move to stay the district court's order on remand."). This Court's February 15 ruling assessed EPA's approval of Florida's assumption program under the *Allied-Signal* factors and found that it is "difficult to make a definitive determination" as to either factor on whether and how the program would operate without the protection provided by the now-vacated BiOp and ITS and whether a scaled back version of the program without incidental take protection could be approved by EPA. Dkt. 163 at 95.

As this Court acknowledges, "the assumption has been in place now for over three years" creating "expectation interests among the affected parties." *Id.* Moreover, "administrative difficulties would result from returning the permitting authority to the Corps." *Id.* Accordingly, both this Court's ruling and the *Allied-Signal* factors suggest that, if the program could be remediated and/or "EPA could authorize a more modest assumption" on remand, then a limited stay should be granted to keep most of the Florida program in place while the federal and state agencies decide next steps. *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236 (D.D.C. 2020) (vacating BiOp but staying the Order for nine months to allow the agency time to produce new BiOp and conservation measures). A stay as to issuance of permits that will not affect endangered species would avoid hamstringing a large number of (likely exceeding 1,000) pending

---

suggested in the post-hearing remedy brief (Dkt.160 at 2 n.1) and addressed in the vacatur ruling (Dkt. 163 at 97), Florida Intervenors currently anticipate renewing their request for entry of partial final judgment under Rule 54(b) or, in the alternative, certification of appeal under 28 U.S.C. § 1292(b).

and forthcoming permit applications that do not implicate the ESA-based concerns underlying this Court's ruling and vacatur order. As also explained below, pending applications for projects that otherwise will undergo Section 7 consultation for other reasons or will otherwise obtain Section 10 coverage should also receive the temporary benefits of this Court's stay discretion. Requiring that category of projects to restart the Section 404 process via transfer back to the U.S. Army Corps of Engineers (Corps) would unnecessarily impose additional unwarranted disruptions with potentially far-reaching consequences for public welfare, environmental protection, and economic development in one of the fastest growing states in the nation.[4]

Beyond just large-scale development projects, the vacatur order directly impedes efforts to review and authorize a wide range of 404 permits currently pending before FDEP. Wolfe Decl. ¶¶ 8-10. Exhibit B provides a list of all applications for individual or general 404 permits currently pending before the FDEP for review to date.[5] This includes approximately 1,065 permit applications of a wide variety, including many projects that benefit the environment and/or the public, such as:

- Four public projects by the State or the Corps to improve water quality in the Everglades (e.g., a shoal repair project, Permit No. 0444917-001), and an emergency pump station repair to avoid flooding of agricultural areas in the Everglades (Permit No. 0444333-001)[6];

- Nearly 200 public projects by state and local governments and agencies, the majority of which are intended to build or improve sidewalks, bridges, utilities, roads, and

---

[4] U.S. Census, *U.S. Population Trends*, available at https://www.census.gov/newsroom/press-releases/2023/population-trends-return-to-pre-pandemic-norms.html (last visited Feb. 24, 2024) (showing Florida as the nation's third most-populous state with the second highest rate of population growth).

[5] Exhibit B was exported from https://prodapps.dep.state.fl.us/pa/summarypending/PaData on February 24, 2024.

[6] Under a longstanding consent decree entered by a federal district court in Florida, the State of Florida is undertaking a significant number of actions in South Florida to remove nutrient pollution from water flowing to the Everglades. FDEP is far along in the process of permitting several of these permits.

highways across the state (e.g., 21 pending applications involving projects proposed by the state transportation department including a project to construct a wildlife crossing over US 27 (Permit No. 0045151-001));

- Nine solar energy projects, including several solar power stations (e.g., Permit No. 0439260-003) and dozens of other electric utility projects impacting grid reliability;

- Stormwater infrastructure repairs and improvements at U.S. Naval Air Station-Pensacola due to damage from Hurricane Sally (Permit Nos. 0442107-003, 0442052-003);

- Three projects to build new medical facilities in different parts of the state, including a new emergency department in South Florida (Permit No. 0426421-001), a new 144 bed behavioral health hospital in Orange County (Permit No. 0433001-001), and an additional campus for the Mayo Clinic in Jacksonville (Permit No. 0441377-001);

- Six projects to construct new schools or improve existing school facilities, including construction of a new charter school (Permit No. 0427091-001) and construction of a secondary access road to address traffic, bus schedules and safety for an existing school (Permit No. 0424791-001); and

- Hundreds of housing projects, including many dozen multi-family or large single family developments (e.g., 128 unit senior living facility (Permit No. 0438783-001)), to provide residences for thousands of people in Florida's fastest growing areas.

After months (and in over 100 cases, more than two years) of permit review, many Florida 404 permit applications were at or near the conclusion of the Section 404 permit process when the Court's February 15 order was issued. Of those currently pending, over 840 permit applications have been in the permit review process for more than six months. Wolfe Decl. ¶10. Now all pending 404 permits in Florida are in some form of regulatory limbo, at least until a new regime can be established or further judicial orders alter the situation.[7] Likewise, many of those permits

---

[7] When the program transferred from the Corps of Engineers to the State of Florida in December 2020, FDEP did not begin issuing 404 permits for approximately five months. Between December 2020 and July 2021, FDEP issued 11 permits under the state 404 program.  While the Corps may be able to issue some new permits, there is limited information at this time about the Corps' timeframes for receiving applications and issuing final permit decisions for over a 1,000 pending Florida 404 permits. Significant delays are certainly to be expected.

would impose mitigation measures benefitting the environment and species conservation, but those beneficial actions are now similarly on hold as well.

Keeping the bulk of Florida's Section 404 Program in place would ensure the greatest degree of environmental protection and, of particular relevance to the cooperative federalism structure of the Clean Water Act, would ensure continued active engagement of both federal and state agencies across all facets of 404 permitting in the State. As extensively briefed in this case, Florida administers the Section 404 program with permit-by-permit oversight by EPA – a process that would continue to work to protect water resources and species. Under Florida's program, FWS receives and reviews all Florida 404 permit applications, and FDEP "shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat." Florida 404 Handbook, Section 5.2.3. This would continue in full force with a limited stay in place.

Alternatively, bringing Florida's Section 404 Program to an abrupt halt would severely disrupt and delay innumerable projects across the state, negate the benefits of cooperative federalism engagement between federal and state agencies, deprive Florida and its citizens of the benefits of substantial investments and expenditures in the existing program, deprive permit applicants with pending permits of the benefits of expenditures on permit applications, and cause various other significant burdens on permit applicants, those who benefit from the projects, as well as the general public.

## IV. Proposed Limited Stay of February 15 Vacatur Order

In its February 15 ruling, this Court set two conditions for a limited stay request:

(1)     the "request should exempt all pending and future permit applications that 'may affect' any listed species under the jurisdiction of the FWS or the NMFS"; and

(2)    the request "should propose a mechanism for determining which permit applications 'may affect' listed species."

Dkt. 163 at 96. As this Court requested, Florida Intervenors have considered whether "any such stay is desirable and workable" and concluded that it is.

Under the requested limited stay, Florida would continue to process applications for all Section 404 permits and permit modifications in assumable waters, except those which "may affect" listed species or designated critical habitat with the contours described herein. This will not eliminate the harsh consequences of vacatur, but it will allow Florida to continue administering the bulk of the 404 program while the state and federal agencies determine appropriate steps to address the Court's order.

To ensure that the limited stay is structured appropriately, Florida Intervenors suggest that at least seven key questions need to be addressed and clarified by the Court, including:

(a)  What is a "may affect" situation for these purposes?

(b)  What process/mechanism should be used to identify a "may affect" situation?

(c)  What options are available to "may affect" permit applicants?

(d)  How should a limited stay address permit applications that otherwise already trigger Section 7 procedures and/or will obtain Section 10 permit coverage?

(e)  To what extent may FDEP continue to enforce Section 404 violations in assumable waters?

(f)  How long should the limited stay be in place?

(g)  If this Court finds that the proposed "may affect" mechanism constitutes an impermissible "partial assumption" (even in the context of a limited stay order), would the approach employed in New Jersey and Michigan provide a legally acceptable alternative model for purposes of the limited stay?

Each of these questions is addressed in turn below.

**A.      First, what is a "may affect" situation?**

As proposed here, a "may affect" permitting situation would include any situation where FDEP, Florida Fish and Wildlife Conservation Commission (FWC), EPA, the U.S. Fish and Wildlife Service (FWS), or National Marine Fisheries Service (NMFS) find, at any point in the permit process, that a Section 404 permit application, if granted, would authorize activities that may affect (or pose a reasonable potential for affecting) endangered or threatened species or critical habitat. *See* 40 C.F.R. § 233.51(b)(2); State 404 Handbook Section 5.2.3 (Fla. Admin. Code). The phrase "reasonable potential for affecting endangered or threatened species" (as used in EPA's Section 404 Program Regulations found at 40 C.F.R. Part 233 and in Florida's Section 404 Handbook Section 5.2.3) is synonymous with the phrase "may affect listed species or critical habitat" (as used in the ESA Section 7 regulations found at 50 C.F.R. Part 402). This "may affect" understanding is consistent with the ESA Consultation Handbook, which explains that "may affect" is "the appropriate conclusion when a proposed action may pose any effects on listed species or designated critical habitat." ESA Consultation Handbook at xvi. This can be both adverse or beneficial effects. Similarly, the Programmatic Biological Opinion defines "may affect" as the "appropriate conclusion made by a federal action agency in the context of the ESA or by the State in the context of the State 404 program when a proposed activity is reasonably certain to affect any ESA-listed species or designated critical habitat." BiOp at vi. The BiOp further notes that the term "reasonable potential to affect" refers to a situation where a "project may affect federally listed species or their critical habitat." BiOp at vii.

**B.      Second, what process/mechanism would be used for "may affect" findings during the period of the limited stay?**

Florida Intervenors respectfully propose to use the existing process set forth in the Memorandum of Understanding (MOU) signed by FWC, FWS, and FDEP, the Florida 404

Handbook (Fla. Admin. Code § 62-331.010(5)), and the Biological Opinion (page 17-30)[8] with certain additional features to alleviate concerns raised by the Court's February 15 order as the mechanism for determining which permit applications have a reasonable potential for impacting listed species or designated critical habitat. This existing process is familiar to the federal and state agencies, the regulated community, and the public. Thus, this process would serve, at least temporarily, as the least confusing and most effective mechanism to meet the Court's conditions for a limited stay.

In the current process, FDEP receives Section 404 applications and forwards a copy of all such applications to FWS and FWC for review. Typically, FDEP, along with FWS and FWC, exchange Requests for Additional Information (RAI). At this early stage in the permit process, FWS and FWC "may determine whether there is reasonable potential to affect listed species, or critical habitats, and if so, the types of effects, and any appropriate protective measures." BiOp at 17. "These determinations are forwarded to FDEP." *Id.* Where a permit application is found to have <u>no</u> reasonable potential for affecting endangered or threatened species or critical habitat, the technical assistance process ends and the state permit process continues. MOU at 13.

For the duration of the limited stay, FDEP would administer the "may affect" process in this manner, with two additional features to further alleviate concerns this Court might have. Additional details for this "may affect" mechanism are outlined below and described in detail in Exhibit C.[9]

_____

[8] While this Court has vacated the Programmatic Biological Opinion, the permit review procedures set forth in the BiOp could still be utilized by the agencies to process permits during the period of a limited stay. In particular, those procedures are consistent with the procedures otherwise set forth in the state regulations underpinning Florida's program.

[9] Florida Intervenors also adopt here their prior arguments and supporting declarations regarding a proper remedy in this case. Dkt. 160, 160-1; Dkt. 162, 162-1.

One, FDEP will consider a "may affect" situation as existing where FDEP, FWC, FWS, NMFS, or EPA find that a permit application, if approved, "may affect" any federally-listed species or designated critical habitat (as opposed to only FWS and FWC). This includes a situation where any of these agencies find that a permit application has a "reasonable potential for affecting endangered or threatened species or critical habitat." In other words, to the extent *any one of these agencies* makes a "may affect" finding, the Court's limited stay order would govern how it is processed.

Two, an initial "no effect" finding may be revisited if, after public notice, any of these agencies (FDEP, FWC, FWS, NMFS, or EPA) find that a permit application "may affect" listed species or critical habitat. In other words, the initial "no effect" finding for a permit application can be reconsidered based on comments received during the public notice process or other new information that is received during the permitting process.[10]

## C.    Third, if one of the agencies triggers a "may affect" finding, what options would be available to the permit applicant?

Under the limited stay requested here, any "may affect" permits would be processed in the manner set forth in the stay order. Based on a review of the current program, Florida currently estimates that approximately 15% of Florida 404 permit applications (including general permits and individual permits) trigger a "may affect" finding.[11] *See* Wolfe Decl. ¶ 13. For "may affect" permits, FDEP would invite the permit applicant to select one of the following options:

(1)    Request that FDEP hold the permit application in abeyance pending further notice from the applicant;

---

[10] As explained in the BiOp, these procedures typically ensure that FWS has at least 55-70 days to provide an initial "may affect" finding. BiOp at 17.

[11] This Court noted a possible discrepancy between Florida's estimate in 2019 that approximately 10% of Florida permit applications require some form of incidental take coverage, while Florida estimated in its most recent filings with this Court that approximately 1.4% of

(2)     Amend the permit application with changes to ensure "no effect" on listed species/critical habitat;

(3)     Withdraw the permit application; <u>or</u>

(4)     Request that FDEP transfer the permit application file to the Corps of Engineers for processing.

This set of options accounts for the evolving 404 situation in Florida while also seeking to minimize concerns based on EPA's view about "partial assumptions" of the 404 program. (As explained later in this Motion, if EPA's concerns in that respect are a hindrance to this Court's inclination to grant the limited stay as requested here, this Court should simply align the limited stay with the approaches allowed by the federal agencies in New Jersey and Michigan.)

**D.      Fourth, what happens to Florida 404 permit applications that independently involve Section 7 procedures (e.g., federal funding) or otherwise are obtaining Section 10 coverage?**

Florida Intervenors would respectfully suggest at least one "may affect" scenario where FDEP should retain 404 permitting authority during the period of the limited stay: permit applications where a project has been, is, or necessarily will be subject to a Section 7 consultation process (*e.g,*, for a project requiring an additional federal action triggering Section 7 consultation procedures)[12] or a Section 10 Incidental Take Permit process (*e.g.*, for a project where the applicant has voluntarily decided to obtain a Section 10 permit).  This carve-out would be consistent with

---

Florida 404 permits indicate incidental take. Dkt. 163 at 94. For clarification, the 2019 statistic was an estimate based on *individual permits* issued by the Corps in the years preceding Florida assumption application. The 2024 statistic cited by FDEP in recent briefing is based on *general and individual permits* that were *actually issued by FDEP* during the last three years. As a point of reference, Michigan's public website for its 404 program states that approximately 1% of Michigan 404 permits trigger EPA review there. *See infra* at 18.

[12] For example, FDEP is currently processing various permits for road projects funded through the federal highway program. As federally-funded projects, the Florida Department of Transportation (FDOT) stands in the shoes of the Federal Highway Administration for purposes of obtaining permits and approvals for projects. These FDOT projects are able to undertake Section 7 consultation procedures. This is a clear category of projects that should be exempt from this Court's vacatur order. *See* Wolfe Decl. ¶ 14.

this Court's rationale for its February 15 ruling and ensure that the core concerns underlying this Court's vacatur order are addressed. Those avenues also ensure the requested clear path for judicial review for Plaintiffs or other affected parties as to specific projects with potential effects to listed species. This approach is also already reflected in the Florida process, as set forth in Section 5.2.3 of the Florida 404 Handbook and as approved by EPA, so it should not require modification of the program to implement.

E.      **Fifth, may FDEP continue to enforce Section 404 violations in all assumable waters during the pendency of the limited stay?**

FDEP is committed to fair and vigorous enforcement of the Section 404 program. To that end, Florida Intervenors also wish to emphasize that, for the duration of the limited stay, FDEP should be viewed as retaining primary enforcement authority in all assumable waters for any violations. This clarification is particularly important with regard to *unpermitted* discharges (i.e., where persons engage in dredge and fill activities in assumable waters in Florida without obtaining a 404 permit). The limited stay should clearly state that nothing in the order restricts Florida's authority to enforce the Section 404 program in assumable waters. As always, the Clean Water Act specifically allows for parallel federal enforcement where warranted. *See* 33 U.S.C. § 1344(n).

F.      **Sixth, how long should the limited stay remain in effect?**

Florida Intervenors respectfully suggest that the limited stay should be in place for at least six months, with the possibility of extensions as granted by this Court as circumstances may warrant. Courts in this Circuit have regularly stayed vacatur of agency decisions for the amount of time it would take for the federal agency (or the state with delegated authority) to remedy the issue. *Friends of Earth*, 446 F.3d at 148 ("[W]e remand to the district court with instructions to vacate EPA's approvals… however, [] the parties may move to stay the district court's order on

remand to give either the [State with the flawed delegated CWA program] or EPA a chance to [remedy the vacated issue]. These timelines defer to the discretion of the agency on the length of time."); *Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 501 (D.C. Cir. 1988) ("Because we are not in the best position to determine the shortest reasonable timetable ..., we remand the case for [the] district court to establish, in consultation with the parties, an expedited schedule for further rulemaking proceedings consistent with this opinion.").

G.     **Seventh, if this Court declines this proposed "may affect" process based on Federal Defendants' "partial assumption" concern, would the approach employed in New Jersey and Michigan serve as an appropriate mechanism for the duration of the limited stay?**

Florida Intervenors have previously expressed concerns with "partial assumption" given EPA's position that states must assume the *entirety* of the 404 program in assumable waters. Dkt. 162-1 at 2.  Federal Defendants continue to have reservations about a limited stay that "federalizes" permit applications on the basis of a "may affect" mechanism. Dkt. 165. Florida Intervenors share that concern, but respectfully suggest that the "may affect" process set forth in this Motion navigates those concerns appropriately in the context of a limited stay, within the confines of the conditions set by this Court in its February 15 ruling.[13]

Nevertheless, if this Court is not inclined to grant a limited stay based on the proposed "may affect" mechanism presented above, Florida Intervenors respectfully request that this Court fashion a limited stay following the New Jersey and Michigan approach. Under that form of limited stay, FDEP would continue to implement both the existing technical assistance process (as reflected in the Florida-specific program documents) as supplemented by the same basic "Procedures" set forth in Section III of the New Jersey-EPA-FWS MOA (AR FWS-006148 to -

_____

[13] To the extent this Court set those conditions in light of New Jersey permits being "federalized" in "may affect" or even "adversely affect" situations, that underlying premise is not correct and would be a basis for altering the conditions set by this Court for a limited stay.

006152). The procedures used in all three states are similar in relevant respects. While incidental

take liability coverage would not be provided to Florida 404 permittees under that process, it

would still serve as a consistent and appropriate process for species review purposes (including

for purposes of 40 C.F.R. § 233.51). And since it is the process currently employed by EPA and

FWS in New Jersey and Michigan, implementation in this context should not pose partial

assumption concerns.

In the case of New Jersey, FWS has committed via MOA to review a state 404 permit

where a "may affect" situation exists (but not otherwise). *See* New Jersey-FWS MOA at 3-4

(FWS-006148 to 006149) (explaining that "NJDEP staff will screen" all general permits for

potential impacts to species and send over for FWS review any general permits that NJDEP

determines to have "potential to adversely affect federally listed species," and NJDEP provides

FWS "with a copy of all applications for individual permits from locations with federally listed

species"). Yet, under the New Jersey MOA, a permit is only *federalized* (transferred to the Corps

for processing, as opposed to simply sent to FWS/EPA for federal review) if EPA/FWS actually

*objects* to NJDEP's plans to issue a permit and imposes conditions that NJDEP refuses to accept.

*Id.* at 4-5 (FWS-006149 to -006150). Again, that is the same basic process already used in

Florida.

Here, it is important to pause to address a potential misconception in this Court's

February 15 ruling, which describes the New Jersey model as involving a process where "the

State [of New Jersey] has agreed to 'federalize' – *that is, pass to the FWS and NMFS for*

*review* – any permits that might affect protected species…" Dkt. 163 at 23 (emphasis added).

Earlier in its ruling, the Court similarly describes the New Jersey model as involving a process

where "EPA can *federalize those applications likely to adversely affect listed species*, thereby

triggering Section 7 consultation…" Dkt. 163 at 5 (emphasis added). This understanding of the New Jersey model (and the Michigan model) warrants some clarification. Federal "review" is not the same as "federalizing." Specifically, federal "review" for purposes of 40 C.F.R. §§ 233.50-.51 involves EPA/FWS evaluating whether a permit application will jeopardize listed species or adversely modify designated critical habitat, whereas "federalizing" a state 404 permit occurs when EPA, after a state refuses to deny a permit or otherwise fails to adequately address a concern raised by the federal agencies, takes the permit away from the state and hands it to the Corps of Engineers for processing (in accordance with 40 C.F.R. § 233.50(j)). In New Jersey, EPA does <u>not</u> "federalize those applications likely to adversely affect listed species." *Compare* Dkt. 163 at 5. To the contrary, state 404 permits in New Jersey undergo "federal review" (i.e., review by FWS and EPA) and terms and conditions provided by EPA/FWS can be incorporated into the New Jersey 404 permit, but those permits are only "federalized" in "the event that [New Jersey] neither satisfies the EPA's objections or requirements for a permit condition … nor denies the permit…" *See* Section III(K)-(O) of the MOA between NJ-FWS-EPA (FWS-006152). New Jersey has an opportunity to accept the conditions to avoid adversely affecting listed species. See Section III(L). If New Jersey does not agree to those actions specified by  FWS, FWS then proceeds with making a "finding as to whether the proposed permitting action *is likely to jeopardize the continued existence of the federally-listed species, adversely modify or destroy designated critical habitat, or result in the incidental take of federally-listed species.*" Section III(M) (emphasis added). And New Jersey "may also include" other "appropriate terms and conditions to minimize or avoid adverse effects" to listed species. *Id.* Ultimately, EPA's objections and possible "federalizing" of a New Jersey 404 permit is not based on "adversely affecting" species; those objections must be based on a finding that issuance of the permit would

"jeopardize" the continued existence of listed species or adversely modify designated critical habitat or otherwise fail to "avoid or minimize incidental take of federally-listed species." *See* Section III(N)-(O). Crucially in fact, this is the same basic process already used in the Florida 404 program for purposes of the "federal review" requirements under 40 C.F.R. Part 233. Additionally, at the back end of the federal review process in New Jersey, an objection "may be reconsidered if the project, as permitted by NJDEP, changes or if additional information on federally-listed species or designated critical habitat becomes available." Section III(P).

Michigan has a MOA with EPA governing Michigan's Section 404 Program, but unlike Florida and New Jersey, Michigan apparently has no MOA with FWS for conducting species reviews. Instead, the Michigan-EPA MOA provides that FWS reviews permit applications for projects proposing "discharges with reasonable potential for affecting endangered or threatened species as determined by the USFWS." Thus, in Michigan, FWS *reviews* state 404 permit applications where *Michigan* finds that a project "may affect" listed species. This is spelled out on the 404 website for the Michigan Environmental Department (agency known as "EGLE")[14]:

> [Michigan's] 1983 Memorandum of Agreement (as amended) with USEPA Region 5 outlines the procedures to be followed in program administration. This agreement waives federal review of the vast majority of applications in areas under Michigan's 404 jurisdiction. However, federal agencies must review projects which impact critical environmental areas, or which involve major discharges. These projects are identified in the Memorandum of Agreement [to] include … [p]rojects with potential to affect endangered or threatened species as determined by the U.S. Fish and Wildlife Service… At the present time, USEPA reviews about one percent of all applications received. If EGLE determines that an application under Michigan's 404 program is subject to federal review, copies of the public notice are sent to USEPA Region 5, Detroit District Corps, and the U.S. Fish and Wildlife Service. The USEPA is responsible for compiling all federal comments and submitting comments on the federal position to EGLE....

---

[14] *See* https://www.michigan.gov/egle/about/organization/water-resources/wetlands/state-and-federal-wetland-regulations.

In other words, in Michigan and New Jersey, a "may affect" finding (or even a finding of "likely to adversely affect") does not result in transfer of the permit application to the Corps of Engineers (federalizing). For both of those state 404 programs (which, again, do not have now, and never had, any programmatic biological opinion), Michigan and New Jersey continue to process all "may affect" permits *unless and until* the state refuses to adopt conditions imposed by EPA and/or FWS in a "jeopardy" or "minimize incidental take" situation. That serious disconnect between what this Court may envision for a "may affect" mechanism and what actually happens in New Jersey and Michigan warrants further consideration with respect to the appropriate remedy here.

 A limited stay built on the New Jersey and Michigan approach has other virtues as well. Most notably, that form of limited stay would avoid imposing restrictions and burdens on Florida 404 permit applicants that are not applicable to Michigan and New Jersey 404 permit applicants as it relates to species reviews. It is one thing to say that state permittees in Florida will no longer receive incidental take liability protection via state 404 permits; that is already the case in New Jersey and Michigan (since formal consultation procedures were not used in either state's 404 assumption process). But it is something else entirely to say that Florida 404 permit applications are *automatically* transferred to the Corps of Engineers on the mere basis of a "may affect" finding, where that is *not* the actual practice in New Jersey or Michigan and it potentially runs afoul of partial assumption concerns. As an exercise of this Court's equitable discretion, this Court's limited vacatur remedy should take into account equitable treatment of the three states in this particularly unique context. Likewise, even though this Court finds fault with the formal consultation approach employed by Florida, EPA, and FWS, that is a process that goes above and beyond what was done in the other two states at the assumption stage.

Likewise, a limited stay built on the New Jersey and Michigan approach would obviate many of the difficult implementation questions identified earlier in this Motion. For example, it would simplify the "may affect" approach and mechanism, and it would create fewer scenarios where complex questions of "federalizing" permits need to be addressed. The Corps of Engineers would, likewise, not be met with an onslaught of permits for processing from scratch. And it avoids many concerns related to reducing Florida's enforcement authority over assumable waters.

## CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully move for a limited stay of this Court's February 15 vacatur order, as described above and set forth in the proposed order filed concurrently. Given the urgency of the issue, Florida Intervenors respectfully request expedited decision on this Motion.

Dated:  February 26, 2024

Respectfully submitted,

BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Lily N. Chinn (D.C. Bar No. 979919)
101 California Street
San Francisco, CA 94111
Phone: (415) 291-6200
lily.chinn@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995

Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERIFICATE OF SERVICE**

I hereby certify that on this the 26th day of February 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com