# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| *Plaintiffs,* | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | Civil Action No. 21-119 (RDM) |
| *Defendants,* | |
| and | |
| STATE OF FLORIDA, *et al.*, | Brief of *Amici Curiae* Supporting Florida Defendants' Request for a Stay |
| *Defendant-Intervenors.* | |

# BRIEF OF *AMICI CURIAE*
# IN SUPPORT OF
# THE FLORIDA DEFENDANTS' REQUEST FOR A STAY[1]

---

[1] Amici include the Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; Lennar Corporation; G.L. Homes of Florida Corporation; GreenPointe Holdings; KB Home; Pulte Group; Taylor Morrison; the Florida Transportation Builders' Association, Inc.; the Florida State Hispanic Chamber of Commerce, Leading Builders of America; and the Associated Industries of Florida.

## INTRODUCTION & INTEREST OF *AMICI CURIAE*

Sensing the disruptive consequences of vacatur, the Court's Order of February 15, 2023, invited the Defendants to request a limited stay, so long as their proposals exempted all pending and future permit applications that "may affect" any listed species under the jurisdiction of the United States Fish and Wildlife Service or the National Marine Fisheries Service. *See* Dkt. No. 163, at 96. The Court further requested that the Defendants propose a mechanism for determining which permit applications "may affect" listed species, noting that "the Court will leave it to the administrative agencies to determine, at least in the first instance, whether any such stay is desirable and workable, and, if so, how it should work." *See* Dkt. No. 163, at 96.

The Florida Defendants moved for a limited stay based on a "may affect" concept referenced by the Court, and they have set out the way in which the State will implement the Section 404 permitting process during a potential stay. *See* Dkt. No. 166, at 2. But recognizing the "partial assumption" concerns raised by the Federal Defendants, *see* Dkt. No. 165, Florida also proposed an alternative: allowing for a regime consistent with the New Jersey/Michigan models. *See* Dkt. No. 166, at 2. Given Florida's experience with the Section 404 permitting process, as well as the cascading economic calamity that will befall the State if the Court adopts the Federal

Defendants' all-or-nothing approach, Amici respectfully submit that the Court should defer to Florida's judgment on the workability of a modified program.

Because affordable-housing construction requires a stable regulatory environment and economies of scale, these homebuilders plan meticulously for large residential subdivisions, and they rely on long-term projections to bring a home to the market. Large communities in particular require coordination of an astonishing number of permits, entitlements, and contracts. Delay of any essential permit snowballs through all subsequent planning and coordination aspects. The result: production delays, which increase costs for *all* parties—large and small—in the construction industry.

Homeowners, buyers, and renters currently struggle with high housing costs due to lack of supply, lack of developable land, issues with material availability, persistently high borrowing costs, and other economic impediments. Halting, even briefly, permit approvals (some of which took five years to complete) aggravates these costs tremendously. Given the existing housing shortfall in Florida, vacatur without a stay will devastate Florida's housing supply and the rest of the State's economy.

Halting construction would have other public impacts. For example, local governments assess impact fees on property developers to pay for infrastructure improvements and local concurrency requirements to enhance local public

infrastructure. This funds important public services, including schools, libraries, parks, water and sewerage, police, and fire-protection services. Without impact fees or concurrency approvals, local governments will experience revenue shortfalls while necessary infrastructure projects—including panther crossings and other species-protection enhancements—will stall.

Amici are well poised to speak on the tremendous disruption that would arise in the absence of a stay. They include production homebuilders currently operating across the entire State. Indeed, they provide the lion share of new housing. For example:

**The Florida Chamber of Commerce:** The Chamber was founded in 1916. As an organization, the Chamber's mission has been to encourage a business-friendly climate to spur private-sector job creation and general economic growth, including through regulatory reform and streamlining of state and federal permitting requirements. The Chamber and its members reflect a cross-section of Florida. Members include businesses of every size from the large multinational companies to the family businesses. Members provide products and services for, among other things, the tourism industry, construction, agriculture, retail, manufacturing, conservation, and space exploration.  The Chamber and its members remain committed to science-based policies for water, land use, energy, and growth that prioritize long-term sustainability over short-term gains. The Chamber and its

members remain mindful that Florida is a rapidly growing State; over four million new residents are expected to move to Florida by 2030 with nearly two and a half million new drivers on Florida roads who will need nearly two million new jobs. The Chamber therefore advocates for predictable, streamlined, and effective permitting that balances growth with the preservation of unique ecological treasures like the beaches and wetlands so vital to our economy. In helping Florida grow, Chamber members apply for and obtain Section 404 permits for a wide variety of projects such as community developments (homes, schools, hospitals), environmental restoration projects, and mining operations.

**The Association of Florida Community Developers, Inc.:** Founded in 1984, the AFCD is dedicated to advocating for policies that support high-quality community development across the State of Florida. The AFCD's mission is to provide a leadership role in the creation of quality community developments and the formulation of responsible approaches to the planning and development of Florida's future. Members of the AFCD advocate for an effective and efficient planning and policy framework to encourage and support economic development while retaining Florida's natural beauty (its beaches and wetlands, for example); this balance, the AFCD believes, helps draw tourists and new residents to Florida.

**The Mosaic Company:** A member of the Florida Chamber of Commerce, the Mosaic Company is the world's leading integrated producer of concentrated

phosphate and potash, essential nutrients for fertilizer used throughout the world. Mosaic mines phosphate in Florida's Bone Valley, which contains the largest known deposits of phosphate in the United States. Mosaic's mining activities must comply with various federal, state, and local regulations; permits under Sections 404 and 402 of the Clean Water Act are but two of the necessary authorizations needed for Mosaic to mine it in the region and produce agricultural nutrient products. Vacating the Section 404-permitting process in Florida creates needless uncertainty for Mosaic.

**The Florida Homebuilders Association:** A member of the Florida Chamber of Commerce, the Association represents the interests of Florida's homebuilding industry and, more specifically, its 8,145 members throughout the State. Given Florida's unique geography and topography, homebuilders throughout the State often must obtain permits under Section 404 of the Clean Water Act and the State's analogous permitting scheme under Chapter 373 of the Florida Statutes. Vacating the Section 404-permitting process in Florida would create needless uncertainty for the Association and its members as they continue to meet the needs of a growing State.

**The Florida Transportation Builders' Association:** The FTBA represents approximately 500 members in the transportation construction industry in Florida. FTBA membership engages in planning, design, construction, and maintenance of

federal and state roadways amounting to 95 percent of all public infrastructure work in Florida.

**The Florida State Hispanic Chamber of Commerce:** The Florida State Hispanic Chamber represents a diverse business community with millions of fundamental Latino members as well as a cross section of business relationships in Florida.

**The Leading Builders of America:** LBA is a trade association representing 21 of the largest production home builders in the United States.  LBA's members collectively build approximately 35 percent of all new homes in the nation at all price points ranging from $150,000 to over $1,000,000 per home. Their members have sold over 100,000 homes in the past two years that were financed through the FHA or the USDA Rural Housing programs. Approximately 75 percent of these were first-time buyers and more than half were sold to people of color.

**The Associated Industries of Florida:** AIF is the voice of Florida business and represents the interests of a broad group of corporations, professional associations, partnerships, and proprietorships in all business sectors. It has represented the interests of prosperity and free enterprise before the three branches of state government since 1920.  A voluntary association of diversified businesses, AIF was created to foster an economic climate in Florida conducive to the growth, development, and welfare of industry and business and the people of the state. AIF

seeks to lessen the burdens government would place on employers, while seeking solutions to conditions that threaten their success. Dealing with significant changes and revisions to federal water policy has frequently required a broad group of interested parties to appropriately address the variety of viewpoints. To this end, AIF established its H2O Coalition ("H2O") for the specific purpose of bringing stakeholders together to comprehensively address state and federal water policy issues using sound-science and sound policy. H2O's membership also consists of a broad and diverse group of stakeholders including agricultural, industrial, manufacturing, power generation, home building, and county and municipal government. AIF and the H2O Coalition have been involved in federal rulemaking affecting Florida in the past, including the federal Numeric Nutrient Criteria in Florida, the multiple iterations of the rule defining Waters of the United States, and the delegation of federal wetland permitting to the Florida Department of Environmental Protection that preceded this litigation. In April 2022, AIF and H2O submitted an Amicus Curiae brief to the U.S. Supreme Court in *Sackett v. Environmental Protection Agency*. AIF's and H2O's members regularly seek Section 404 permits for all manner of projects related to the agriculture, utility, manufacturing, home development, and transportation sectors.

## ARGUMENT

### I.   VACATUR WITHOUT A STAY WOULD BE DEVASTATING.

As the court has already recognized, it has an obligation to consider the disruptive consequences of the relief it orders. *See e.g., Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). This includes effects on the parties, third parties, and the general public. *Id.* Despite Plaintiffs' insistence to the contrary, the destructive impact that vacatur without a stay would inflict on the State manifestly outweighs the far-more-speculative harm they suggest (especially given Florida's demonstrated commitment to endangered- and threatened-species protection). A stay is thus warranted.

### A.   A delay in permitting is inevitable.

To be certain, delays will occur without a stay. Transferring Section 404 permitting authority to the U.S. Army Corps of Engineers will freeze permit processing throughout the State—how long remains unknown. That said, Florida needed five months after assuming the Section 404 permitting process to begin issuing permits, and it only issued eleven between December 2020 and July 2021. Even if the Corps could move twice as fast, the thousands of permit applications currently pending in Florida would begin to petrify.

This risk is not speculative, nor can it be assumed that the Corps is ready to hit the ground running. Applications transferred from the State (1,065, according to

the State) must start from square one, no matter how far along the State's review process had progressed. And there is no indication that the Corps is poised to replace the more-than three-hundred State employees who had been hired and trained to implement Florida's 404 program. *See* Dkt. No. 160, at 5. To cover this immediate influx, the federal government will need to identify funding sources, hire staff, and then train those hires to process Florida's pending permits. Common sense dictates that this process will not conclude (or perhaps even commence) without substantial delay, especially given the Corps current workload relating to their responsibility over retained waters.

Granting the State's requested stay will largely obviate these delays. The permits that do not raise concerns will progress in the normal course. And those permit applications that "may affect" a protected species (thus necessitating federal review) would constitute a volume far less monstrous for the Federal Government to handle. Indeed, the State estimates that only 15 percent of all individual and general Section 404 permits trigger a "may affect" finding. *See* Dkt 166, at 3, 11. Given the smaller burden inflicted on the federal government, permit applications falling into *both* categories ("may affect," and "won't affect") will proceed far more efficiently and rapidly.

10

**B.    The economic consequences of another reset will be staggering.**

The inevitable delay that would arise without a stay would devastate Florida's construction industry (directly) and would wound State's economy (as a downstream effect), exacerbating the affordable housing crisis. Amici represent many Section 404 permit applicants, and many of the permits submitted by those applications are set out in the exhibit attached to the State's motion. *See* Dkt. No. 166-2 (Ex. B). They can attest—a vacatur without a stay would be cataclysmic. Even a six-month delay would cost tens of millions collectively. In turn, not only would mortgage rates spike precipitously, but land prices, building materials, and labor would rise even further than they have in recent years, making affordability a daunting challenge.

The developers are not the only ones with a dog in this fight. Halting a project cascades to third-parties, like contractors, suppliers, consultants, local government, and the public. All trades, manual labor, and other work forces will suffer, including many small and minority-owned businesses. And Amici would be remiss if they failed to note that environmentally friendly projects would also screech to a halt given a vacatur without a stay. As shown by the preliminary-injunction intervenors, *see* Dkt. No. 146, many pending projects include things like Florida-panther crossing and other environmentally protective enhancements. These private, yet eco-friendly, ventures would also be delayed (perhaps indefinitely) in the absence of a stay.

Amici Lennar Homes, has a project that demonstrates the potential chaos that vacatur without a stay would inflict. One of Lennar Homes' projects has been working on obtaining its Section 404 approval for a multi-use development project in Pasco County. The application was pending before the Corps in 2019 when it was transferred to the FDEP in year 2020. This project had to begin from scratch under the FDEP and was again on the brink of receiving its approval when FDEP's authority was suspended. It includes residential, commercial spaces, a public trail system connecting the development to the regional trail system, a charter school, and a significant roadway network providing improved and much needed transportation options within the larger region. The current vacatur renders the future of this project and investment in public infrastructure uncertain, even though it would meet the strictures of the New Jersey model (discussed *infra*), since the FWS determined the project will not adversely impact species or cause jeopardy.

## II.    THE STATE HAS PROPOSED WORKABLE SOLUTIONS.

As representatives of Florida Section 404 permit applicants, Amici can assure the Court that Florida's proposed solutions are patently workable. This is true whether the Court opts for the detailed proposal that Florida offers, or instead chooses to implement the regimes used in New Jersey or Michigan.

**A.      The New Jersey/Michigan models are obvious choices.**

The easiest way for the Court to avoid the economic disaster that would ensue in the absence of a stay would be to follow the well-trodden paths of Florida's sister states. New Jersey, for instance, issues Section 404 permits for projects that either (1) have no effect on listed species, or (2) may affect, but are not likely to adversely affect, listed species. In both scenarios, Section 404 applicants seek technical assistance (i.e., "informal consultation") from the U.S. Fish and Wildlife Service. If the FWS agrees with either effect determination, New Jersey's process continues, because there is no take of listed species. If FWS anticipates a "may effect, likely to adversely affect" conclusion, then formal consultation under Section 7 of the ESA is triggered and such projects would be transferred to the federal agencies for review. New Jersey has shown that this process works (and has for decades), and it covers the concerns set out in the Court's vacatur order.

Michigan's Section 404 permitting regime would similarly work. Michigan's Memorandum of Agreement with the Federal Government provides that, federal agencies must review projects that impact critical environmental areas, or that involve major discharges, which expressly include "[p]rojects with potential to affect endangered or threatened species as determined by the U.S. Fish and Wildlife Service." Dkt. No. 166, at 17. In other words, Michigan's system works, it has for

decades, and it (like New Jersey's) animates the Clean Water Act's cooperative-federalism spirit while also ensuring Endangered Species Act compliance.

Implementing either (as the State proposes) would alleviate the Court's concerns while preventing tremendous injury on the entirety of Florida's construction industry. Amici wholeheartedly encourage the Court to consider them.

### B.   Alternatively, the mechanism for determining which permit applications "may affect" listed species is workable.

Given State's unique ecosystems, the State has painstakingly offered the Court a Florida-specific way in which to administer the Section 404 program while the remand remains underway. Despite the Federal Defendants' practicability concerns, Amici are convinced that Florida's proposal is quite administrable. And even if some complexities arise, dealing with those is far superior to full vacatur without a stay, given the economic detriment that will necessarily ensue without it.

The Federal Defendants "practical" concerns are easily assuaged. *See* Dkt. No. 165, at 2. Indeed, the State has addressed all of them. *See* Dkt. No. 166, at 9-14. For example, the Federal Defendants note that Florida and the Corps require applicants for individual Section 404 permits to submit different information. *See* Dkt. No. 165, at 2. But prospective applicants like Amici are more than willing to bear this burden or potential redundancy to avoid a far greater evil: beginning the entire process anew. Indeed, they are used to navigating two different regimes, given the Program's different treatment of permitting for "assumed" and "retained" waters.

In other words, state and federal agencies know how to coordinate and determine at the threshold which entity will process a permit application.

Simply put, Florida's proposed framework harmonizes with the Endangered Species Act (indeed, it is rooted in the ESA Consultation Handbook). It allows all relevant federal agencies to determine whether a permit application has a "reasonable potential for affecting endangered or threatened species or critical habitat" after public notice, *see* Dkt. No 166 at 10-11, which extends *more* protection than the run-of-the-mine Section 7 consultation process (and should thus allay the concerns that resulted in the Court's vacatur order). Finally, Amici stand at the ready to work within that proposed framework, and implementing it via a stay during the remand will work to the best interest of all Floridians (and not just the developers represented here).

## CONCLUSION

For the foregoing reasons, the Court should grant the State's motion for a stay.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages. This brief complies with the typeface requirements of Local Rule 5.1(d) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Office Word processing software in a 14-point Times New Roman type style.

Dated: March 2, 2024

*/s/ Edward M. Wenger*
Edward M. Wenger (DCB No.1001704)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2024, I filed this Brief with the United States District Court for the District of Columbia using the CM/ECF system, which will cause it to be served on all counsel of record.

*/s/ Edward M. Wenger*
Edward M. Wenger (DCB No. 1001704)