# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      Plaintiffs,

      v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

**CASE NO.** 1:21-cv-00119 (RDM)

**PLAINTIFFS' RESPONSE TO DEFENDANT-INTERVENORS' MOTION FOR A
LIMITED STAY OF THE COURT'S FEBRUARY 15, 2024, RULING**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STANDARD.......................................................................................................................... 2

ARGUMENT ........................................................................................................................ 2

    I.    The Federal Defendants Have Concluded That Federal Resources Would Be Better Spent With the Corps Administering the Entire 404 Program.............................................. 3

    II.   Florida's Proposal for a "May Affect" Limited Stay Would Create More Confusion and Would Continue to Violate the ESA................................................................... 4

    III.  The Court Should Decline Florida's Additional, Alternative Requests, Which Would Allow the State to Administer "May Affect" Permits Contrary to the Court's Ruling. ...... 7

    IV.  A Limited Stay While Plaintiffs' Remaining Claims Are Pending Would Also Create Confusion. ............................................................................................................ 11

    V.   Vacatur Would not Deprive any Party of Significant Rights............................................. 13

CONCLUSION.................................................................................................................... 15

CERTIFICATE OF SERVICE ........................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

\* *Anacostia Riverkeeper, Inc. v. Jackson*,
   713 F. Supp. 2d 50 (D.D.C. 2010) ..............................................................2

\* *Bauer v. DeVos*,
   332 F. Supp. 3d 181 (D.D.C. 2018) (Moss, J.) ............................................2

\* *Chamber of Com. v. Sec. and Exch. Comm'n*,
   443 F.3d 890 (D.C. Cir. 2006) ....................................................................2

*Ctr. for Biological Diversity v. Ross*,
   480 F. Supp. 3d 236 (D.D.C. 2020) ............................................................6

\* *Fleck v. Dep't of Veterans Affs. Off. of Inspector Gen.*,
   651 F. Supp. 3d 46 (D.D.C. 2023) ..............................................................7

*Friends of the Earth, Inc. v. Env't Prot. Agency*,
   446 F.3d 140 (D.C. Cir. 2006) ..................................................................13

*Friends of the Earth v. Env't Prot. Agency*,
   No. CIV.A. 04-0092, 2006 WL 7066924 (D.D.C. Sept. 18, 2006) ............13

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ..........................................................13

*Nat'l Treasury Emp. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988), Dkt. 166 ..................................................13

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................2

**Federal Statutes**

5 U.S.C. § 702 ....................................................................................................5

16 U.S.C. § 1536(a)(2) ......................................................................................4

**Federal Regulations**

50 C.F.R. § 402.14(a) ....................................................................................4, 16

**State Statutes**

Mich. Comp. Laws §§ 324.36501–07 ..............................................................10

**Other Authorities**

*Listed Species with Spatial Current Range Believed to or Known to Occur in Each State*, USFWS, https://ecos.fws.gov/ecp/report/species-listings-by-state-totals?statusCategory=Listed (last visited Mar. 6, 2024) ........................................................10

*State and Federal Wetland Regulations*, Mich. Dep't Env't, Great Lakes, & Energy, https://www.michigan.gov/egle/about/organization/water-resources/wetlands/state-and-federal-wetland-regulations (last visited Mar. 6, 2024) ...................................................................................................................................15

*Threatened + Endangered Species: Florida Everglades*, Fla. Museum, https://www.floridamuseum.ufl.edu/southflorida/regions/everglades/endangered-species (last updated Jan. 24, 2022)......................................................................7

## INTRODUCTION

On February 15, 2024, the Court ruled that U.S. Fish and Wildlife Service ("USFWS") violated the Endangered Species Act ("ESA") by producing a programmatic biological opinion ("BiOp") for the Environmental Protection Agency's ("EPA") approval of Florida's 404 program that failed to perform any of the ESA-required analyses, punted all analyses to a non-statutory permit-level review process with none of the ESA's guardrails, and still shielded EPA, the State, and state permittees from incidental take liability. Dkt. 163. The Court ruled that EPA unlawfully relied on that BiOp to approve Florida's program. *Id.* After considering the *Allied-Signal* factors, the Court vacated the BiOp, the incidental take statement ("ITS"), and EPA's approval of Florida's program, restoring permitting authority to the U.S. Army Corps of Engineers ("Corps"). Dkt. 163 at 93, 96. The Court invited the Defendants to propose a limited stay which could allow the State to continue permitting projects that would not affect ESA-listed species, if the agencies deemed such a stay "desirable and workable." *Id.* at 96.

The Federal Defendants oppose a limited stay as undesirable and unworkable. Dkt. 165 at 1 & n.1. They aver that the Court's invitation raises questions that would require considerable time and resources to resolve, all of which "might otherwise go toward processing permit applications." *Id.* at 2. Florida proposes a stay that would create additional confusion, continue to violate the ESA, and fail to address the concerns articulated by the Federal Defendants. Florida's proposal also effectively asks the Court to reconsider part of its decision without demonstrating that reconsideration is necessary. In the alternative, Florida asks the Court to authorize a modification of its program without notice and comment or EPA's approval.

While Plaintiffs believe the Court has the discretion to order the limited stay its ruling contemplates, the Court should deny Florida's motion because it fails to meet the standard for staying the vacatur of unlawful agency action. The Court should also deny the motion because

1

Plaintiffs have demonstrated that the program suffers deficiencies beyond the ESA violations which affect the State program as a whole.  It would conserve resources and the interests of justice for these to be considered together on remand after the Court has ruled on the remainder of Plaintiffs' claims.  The least disruptive path forward, which would also serve developers' interest in clarity, *see, e.g.*, Dkt. 167 at 2–3, is therefore to deny a limited stay, leave permitting authority with the Corps, and allow Florida to propose a new program subject to EPA approval.

## STANDARD

The decision to stay vacatur falls within the court's remedial discretion.  *Bauer v. DeVos*, 332 F. Supp. 3d 181, 185 (D.D.C. 2018) (Moss, J.).  When exercising this discretion, courts in the D.C. Circuit have found such a stay warranted when the factors in *Allied-Signal* are satisfied and (1) immediate vacatur would create confusion, *see Chamber of Commerce v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006); (2) all parties support a stay, *see Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 52–55 (D.D.C. 2010);[1] or (3) "a prolonged agency remand threatens to deprive one or more parties of significant rights," *Bauer*, 332 F. Supp. 3d at 185. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion."  *Nken v. Holder*, 556 U.S. 418, 433–43 (2009).

## ARGUMENT

While the Court has the discretion to grant a limited stay consistent with its February 15, 2024, decision, none of the factors for granting a stay are present here.  The Federal Defendants oppose a limited stay, having concluded that such a stay would be undesirable and unworkable and that federal resources would be better spent with the Corps simply administering the

---

[1] Parties often agree to a stay where immediate vacatur of an unlawful rule would cause more harm than good.  *See, e.g.*, *Anacostia Riverkeeper*, 713 F. Supp. 2d at 52 (stay of vacatur warranted where EPA would have to develop entirely new pollution limits and parties agreed that having no pollution limits in the meantime would be worse for the environment).

program.  Florida Intervenors have put forward a convoluted proposal that would only create

additional confusion and perpetuate violations of the ESA.  And neither Florida, Collier

Enterprises, nor Amici have demonstrated that vacatur threatens to deprive them of significant

rights.  Plaintiffs therefore respectfully request that the Court decline to impose a limited stay,

proceed to judgment on Plaintiffs' remaining claims, and, to the extent Florida remains interested

in assumption in light of the Court's rulings, allow the Defendants and Florida to address all

program deficiencies together on remand.

I.      **The Federal Defendants Have Concluded That Federal Resources Would Be Better Spent With the Corps Administering the Entire 404 Program.**

The Court directed the administrative agencies "to determine, at least in the first instance,

whether [a limited] stay is desirable and workable, and, if so, how it should work," Dkt. 163 at

96.  USFWS (the agency charged with administering the ESA), EPA (the agency charged with

authorizing and overseeing state assumption under the Clean Water Act), and the Corps (the

agency charged with administering Section 404 in assumable waters in light of the Court's

ruling) have determined that such a stay would not be workable and that federal resources would

be better spent with the Corps administering the program.  Dkt. 165 at 2.

The Federal Defendants raise many questions that would require considerable time and

agency resources to resolve, including whether applicants would apply to Florida or the Corps in

the first instance, which agency would make "may affect" determinations, and how disputes over

species effects would be resolved.  *Id.*  The Defendants also point out that because the State and

the Corps require different information from permit applicants, an application that begins with

the State but is later transferred to the Corps would require the applicant to apply twice.  *Id.*

Florida's proposal does not adequately address these matters. The clearest path forward would therefore be for the Court to decline a limited stay and allow the Corps to administer the entire 404 program, as it had done for decades before the State assumed authority in 2021.

## II.    Florida's Proposal for a "May Affect" Limited Stay Would Create More Confusion and Would Continue to Violate the ESA.

Rather than provide clarity, Florida's proposal would create confusion and perpetuate violations of the ESA. Florida's proposal provides that state *or* federal agencies *may* make a "may effect" determination but does not impose a duty on any one of them to make that determination (or its counterpart, a "no effect" determination). Dkt. 166 at 9–11. Florida proposes that the agencies continue using the vacated technical assistance process, but that process would allow state agencies alone to make a "no effect" determination. *Id.*; FWS-006028, at FWS-006067 (BiOp); FWS-006015, at FWS-006027 (MOU).

By contrast, the ESA imposes a duty on federal agencies to determine whether actions "may affect" an ESA-listed species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The ESA requires federal agencies to make effect determinations and requires federal agencies to review their actions "at the earliest possible time." 50 C.F.R. § 402.14(a). Aligning with the ESA, the New Jersey 404 program also requires that *USFWS* make "may affect" determinations. FWS-006144, at FWS-006149–50 (NJ MOA III.C.1–3, III.H.1–3).

Florida's proposal fails to impose any duty to make a "may affect" determination and specifically fails to impose that duty on any federal agency. This is not only inconsistent with the ESA. It would also leave Plaintiffs (and the public) without any means to challenge the failure to make such a determination (or the inadequacy of a "no effect" determination) in federal

court.[2]  By contrast, when federal agencies make (or fail to make) these determinations as required by the ESA, Plaintiffs (and the public) can seek review pursuant to the Administrative Procedure Act.  5 U.S.C. § 702.  That under Florida's proposal a "may affect" determination could be made at any time (at the start of the process, during public comment, or whenever new information is received during the permitting process), Dkt. 166 at 10–11, would also create additional uncertainty as to which entity would ultimately process the permit.

The Federal Defendants have identified difficult questions of which agency would make effects determinations and how disputes between state and federal agencies might be resolved, and explain these questions would require considerable agency resources to resolve.  Dkt. 165 at 2.  They also point out that a limited stay would unnecessarily create redundancies by requiring some project proponents to apply twice when their applications are transferred based on a "may affect" determination, because Florida and the Corps require different information.  *Id.*

Indeed, because Florida's program is unlawful, a partial stay would create more confusion.  It would create a period during which the State could continue processing a certain class of permits under its existing program, which could be disrupted if and when Florida proposes (and EPA approves) a new State program addressing the ESA inadequacies and thus setting new parameters for consideration of impacts to listed species.  It could be disrupted again by further changes to the State program addressing additional inadequacies should the Court rule

---

[2] Because EPA's approval of Florida's program was unlawful, the State should not have authority to determine whether a permit "may affect" a listed species or critical habitat.  That determination, for purposes of a limited stay, would have to be made by EPA, USFWS and/or NMFS, to be consistent with the ESA and the Court's February 15, 2024, ruling.

in Plaintiffs' favor on their remaining claims.[3]  Denying a partial stay would also avoid the

confusion, inherent in Florida's proposal, where a project may get far along in the State process

(including public notice) and then be transferred to the Corps.  *See* Dkt. 167 at 3.

Florida's proposal also fails to account for the fact that the National Marine Fisheries

Service ("NMFS") is not part of the technical assistance process.  Florida makes no provision for

what role NMFS would play in a limited stay.  As the Court found on summary judgment, EPA's

determination that approval of Florida's program would have "no effect" on species under

NMFS's jurisdiction was arbitrary and capricious because it mis-stated the relevant action area.

Dkt. 163 at 86–88.  And although EPA initiated consultation with NMFS in response to this

litigation, that consultation remains on-going.  *Id.* at 87.

Florida then proposes that permit applicants be offered four options when an agency

determines that their permit "may affect" ESA-listed species or their critical habitat, including

making modifications to the application to ensure "no effect" on listed species.  Dkt. 166 at 11–

12.  The questions of how, whether, when, and by whom that determination would be made,

however, presents the same problems as discussed above.  Florida asserts that these options

would address EPA's concerns about "partial assumptions," *id.* at 12, but does not explain how.

That Florida's proposal would also allow applicants to choose to put their applications

indefinitely on hold or to withdraw them appears to contradict Florida and Amici's claim that

delay must be avoided at all cost.  *See id.* at 4–7, 11–12; Dkt. 168-1 at 3–4, 9–12.

---

[3] Florida's reliance on *CBD v. Ross*, Dkt. 166, is also to no avail.  Unlike in *CBD v. Ross*, no
industry will shut down absent a stay because there is another, well-worn, familiar, and lawful
path for developers to obtain permits.  480 F. Supp. 3d 236, 249, 256 (D.D.C. 2020).  *See also*
Dkt. 161 at 14–15 & nn.17–18.

Also, although Florida highlights some categories of permits, its proposal does not address whether any of those would remain with the State or be transferred to the Corps under its proposal. For example, Florida identifies a handful of permits (five) related to the Everglades, Dkt. 166 at 5, an ecosystem Plaintiffs vigorously defend and which is home to many ESA-listed species. *See, e.g.*, *Threatened + Endangered Species: Florida Everglades*, Fla. Museum, https://www.floridamuseum.ufl.edu/southflorida/regions/everglades/endangered-species (last updated Jan. 24, 2022). But Florida has not articulated whether it considers those applications as having "no effect" on protected species. Additionally, Florida's reference to an "emergency" repair application (which according to Florida's chart had been pending for more than a month before the Court's ruling) fails to acknowledge that the Corps has a process for expediting emergency permits as well.

## III.  The Court Should Decline Florida's Additional, Alternative Requests, Which Would Allow the State to Administer "May Affect" Permits Contrary to the Court's Ruling.

Although Florida claims to be seeking the limited stay contemplated by the Court, Florida's request also effectively asks this Court to reconsider its ruling. Such a request requires Florida to show justice requires reconsideration, a burden not met here. *Fleck v. Dep't of Veterans Affs. Off. of Inspector Gen.*, 651 F. Supp. 3d 46, 51 (D.D.C. 2023) (discretion to reconsider interlocutory decisions comes with the "caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."). Florida has failed to provide good reason to battle again.

Florida asks that the Court grant a stay allowing the State to issue permits for projects that may affect species so long as those projects have been or purportedly will be subject to Section 7 consultation (because of some additional federal action) or where the applicant voluntarily decides to seek a Section 10 Incidental Take Permit ("ITP"). Dkt. 166 at 12–13. But

Florida's proposal contains no requirement that certain applicants pursue Section 7 consultation or obtain a Section 10 ITP, and describes no mechanism by which these requirements would be imposed or enforced.  Accordingly, a stay that allows Florida to process applications that merely plan to, but have not yet, completed Section 7 consultation or obtained a Section 10 ITP allows Florida to process projects that may affect species with no guarantee of ESA compliance.  This process goes beyond the Court's instructions relating to a partial stay and would place threatened and endangered species at risk.

Although Florida claims that its 404 Handbook already reflects its ability to process permits where the applicant has a Section 10 ITP or Section 7 BiOp, *id.* at 13, Florida's proposal here is not limited to the situation where the applicant already has received an ITP or is already covered under the ITS of an existing Section 7 BiOp.  Rather, Florida's proposal is to process permits based on unenforceable promises and speculation that those future federal processes will occur and will produce an ITP or ITS actually authorizing all the effects in question.  Florida's forward-looking proposal also overlooks the Defendants' assertion that when the Corps process 404 permits it requests different information from what the State requests of applicants in the state program, Dkt. 165 at 2.  Florida proposes no mechanism that would address these differences which could, in turn, affect the federal wildlife agencies' ESA assessments.

Alternatively, Florida asks the Court to impose a limited stay modeled after New Jersey's approach, claiming it "is the same basic process already used in Florida."  Dkt. 166 at 14–19.  But this is far from true.  The New Jersey approach *requires* USFWS to make a determination on effects to species.  FWS-006144, at FWS-006150 (NJ MOA III.H.1–3).  And if USFWS determines that "that the proposed permit action is likely to adversely affect federally-listed species or critical habitat," the New Jersey MOA *requires* EPA to object.  *Id.*, at FWS-006150–

51 ("For EPA reviews that receive a response from [USFWS] as indicated in III.H.3 above, the federal comments conveyed to the State by EPA *will object to permit issuance*." (emphasis added)) (NJ MOA III.H.3, III.I).  The New Jersey MOA also requires USFWS to make findings as to jeopardy, species effects, and incidental take.  *Id.*, at FWS-006151 (NJ MOA III.M.).  The MOA then requires EPA to make a decision to ensure against jeopardy and to ensure avoidance and minimization of incidental take.  *Id.*, at FWS-006151–52 (NJ MOA III.N.).  These federal actions will either allow the state permit to issue or transfer the permit to the Corps.  *Id.*, at FWS-006152 (NJ MOA III.O.).  There are no such requirements in Florida's process.  Nor have the federal agencies agreed to such a process.

Throughout briefing, the New Jersey approach has been one example of the many options available for EPA and Florida to explore, but that option was rejected in favor of imposing no requirements on EPA or the wildlife agencies and extending incidental take liability through a manipulation of Section 7 programmatic consultation.  The Defendants and Florida now remark that New Jersey's approach employs a "jeopardy" trigger—as opposed to a "may affect" or "may affect, likely to adversely affect" trigger—for federalizing permits (as in transferring those permits to the Corps).[4]  Dkt. 165 at 2–3 & n.2; Dkt. 166 at 3 n.2, 15–17.  Florida goes a step

---

[4] Plaintiffs now recognize that they previously described the New Jersey approach as transferring permits to the Corps based only on a "may affect" determination, when the New Jersey process is more complex.  Some confusion has arisen partly because the term "federalization" has been used to describe both when federal species determinations are required to be made by federal agencies (which USFWS does not consider to be Section 7 consultation) and when permits are transferred to the Corps for processing (which requires Section 7 consultation).  The New Jersey federal review process begins after USFWS has determined that the permit may affect listed species, and further requires USFWS to make a series of species determinations.  It then requires applicants to obtain a Section 10 ITP where USFWS has determined incidental take is likely and requires the Corps to process permits (and engage in Section 7 consultation) where the State objects to federal conditions and EPA determines jeopardy is likely.  FWS-006144, at FWS-006151–52 (NJ MOA III.M–O).

further and urges the Court to authorize modification of Florida's program to match the New

Jersey roadmap in the guise of a "limited stay."  Dkt. 166 at 14.  However, Florida's proposal to

superimpose the species review process that resulted in approval of New Jersey's program onto

Florida's program after-the-fact would be incongruous, impermissible, and inequitable.

  To begin, EPA concluded during informal Section 7 consultation that New Jersey's

program was not likely to adversely affect species (thereby ending EPA's Section 7 duty under

the ESA).[5]  Dkt. 163 at 22 (observing that EPA did not engage in formal consultation to approve

either New Jersey or Michigan's programs).  For Florida, however, EPA concluded during

formal consultation that Florida's program *was* likely to adversely affect ESA-listed species and

cause incidental take.

  As Florida has acknowledged, EPA's assessment of New Jersey's program arose from a

very different context, given that New Jersey has only 17 listed species and 1,400 square miles of

"water area" (about 896,000 acres).  Dkt. 127-1 at 5.  By comparison, Florida has more than 130

listed species and approximately eleven million acres of wetlands.  Dkt. 98 at 21.  The adequacy

of EPA's programmatic consultation as to New Jersey also was not challenged, whereas here, the

adequacy of EPA's consultation as to Florida has been challenged and deemed unlawful.[6]  To

---

[5] This determination relied on USFWS' obligation to make species determinations for all "may affect" permit applications and the requirement for applications to undergo Section 10 review if USFWS determined incidental take was likely or Section 7 review after transfer to the Corps if the State objected to Federal conditions and EPA determined jeopardy was likely.  FWS-006144, at FWS-006156–57 (NJ MOA).  In addition, a Section 10 ITP is a federal action that separately requires Section 7 consultation before it may issue.

[6] Applying Michigan's model would likewise fail for the same general reasons.  For instance, Michigan relies on its own mini-ESA.  *See* Mich. Comp. Laws §§ 324.36501–07.  Florida also has many more listed species than Michigan (26 listed species).  *Listed Species with Spatial Current Range Believed to or Known to Occur in Each State*, USFWS, https://ecos.fws.gov/ecp/report/species-listings-by-state-totals?statusCategory=Listed (last visited Mar. 6, 2024).  And similar to the New Jersey program, the Michigan model was not challenged when the state assumed the program.

avoid on-going ESA violations, a species review process for Florida modeled on New Jersey would have to be adapted in light of these differences, such as by requiring a "may affect" trigger to transfer permits to the Corps.

EPA has previously acknowledged that transferring "may affect" permits to the Corps is an option states may adopt. EPA-HQ-OW-2018-0640-0686, at 1 (Response to Comments for EPA's Consultation Decision). And when Sierra Club and CBD previously proposed this option, the Federal Defendants did not dispute this. Dkt. 135 at 42; Dkt. 148. The Defendants now argue that this would constitute a partial assumption that is inconsistent with EPA's regulations. Dkt. 165 at 3. Regardless of this apparent inconsistency, the Court would not have to reach that question, because a limited stay is an equitable remedy within the Court's discretion pending its final determination on the merits.[7]

## IV.   A Limited Stay While Plaintiffs' Remaining Claims Are Pending Would Also Create Confusion.

Plaintiffs have also sought vacatur of Florida's 404 program on the basis of their still-pending, non-ESA claims. Plaintiffs submit that the State failed to meet Clean Water Act criteria to assume the 404 program based also on these additional program deficiencies. A limited stay may therefore be of limited value (and could lead to more confusion) until the Court has ruled on all of Plaintiffs' claims.

This problem is illustrated by Florida's peculiar request, in the context of a request for a limited stay, to retain primary enforcement authority in all assumable waters, Dkt. 166 at 13,

---

[7] Moreover, because the Court is fashioning an equitable remedy for EPA's and USFWS' violations of Section 7 of the ESA, any limited stay of the vacatur of Florida's program would have to ensure Section 7 is not again evaded. As all agree, the starting point for Section 7 consultation is whether an action "may affect" listed species. EPA's argument that this would constitute impermissible partial assumption under its regulations underlines the propriety of denying a limited stay.

which presumably would include violations of permits issued by the Corps pursuant to a limited

stay. This request goes beyond the Court's invitation to seek a stay. Dkt. 163 at 96. Florida also

provides no rationale for maintaining primary enforcement authority in all matters involving

assumable waters, and the adequacy of its enforcement authority is a hotly contested issue in this

litigation. *See* Dkt. 98 at 56–61; Dkt. 104 at 54–66; Dkt. 123 at 14–15.

Florida's defiance of federal law by continuing to apply the Trump-era definition of

waters of the United States after that definition was vacated by a federal court (and after EPA

instructed Florida to conform to the law), Dkt. 98 at 68, also weighs against Florida's request to

retain primary enforcement authority as to unpermitted discharges as part of a limited stay.

Additionally, Florida asks that the limited stay last at least six months (with the

possibility of extensions), Dkt. 166 at 13–14, but articulates no reasonable basis for this request.[8]

Florida suggests that six months may reflect "the amount of time it would take ... to remedy the

issue." *Id.* at 13. But if the issue Florida refers to is bringing its program into ESA compliance,

that would require modification of state regulations, a new application, a new programmatic

BiOp, and EPA's 120-day review process, which includes a period for notice and comment. As

the Court has noted, EPA has been unable to complete consultation with NMFS in the two years

from when it began preparing a Biological Evaluation. *See* Dkt. 163 at 87. This renders it

highly unlikely that adequate consultation with USFWS, alone, could be completed in six

months, much less all other actions to remedy the Defendants' violations here.

---

[8] Florida's (and Amici's) claim that this duration is necessary to avoid delays in permitting
similar to those that occurred when Florida's program was approved, Dkt. 166 at 6 n.7; Dkt. 168-
1 at 9, ignores that, unlike Florida at the time, the Corps has administered Section 404 in Florida
for decades, and that the Corps has determined that its resources would be better spent
processing permits than attempting to administer a limited stay.

In addition, the issues that relate to the non-ESA claims have been fully briefed and argued to the Court. The Court may therefore rule on the pending claims at any time and may determine, as it has with the ESA claims, that those too are serious violations that cannot easily be cured on remand. *Cf. Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006) (inviting parties to move for stay of vacatur on remand where a stay would serve the interests of both the plaintiffs and EPA); *Friends of the Earth v. EPA*, No. CIV.A. 04-0092, 2006 WL 7066924, at *1 (D.D.C. Sept. 18, 2006) (ordering stay where both plaintiffs and EPA moved for a stay and disagreed only as to its duration).[9]

Unlike in *Friends of the Earth*, where EPA moved for a stay on remand, here EPA opposes a limited stay. Dkt. 165 at 1 & n.1. The Federal Defendants have concluded that federal resources would be better spent processing 404 permits than expending the time and resources that would be necessary to try to resolve complex questions required to administer a partial stay. *Id.* at 2. And, as shown above, Florida's proposal does not answer these questions.

## V.     Vacatur Would not Deprive any Party of Significant Rights.

Lastly, neither Florida, the Defendants, nor the Developers identify the deprivation of any significant right that would result absent a stay. Florida and Amici complain about potential delays in the permitting process (pointing to the apparently acceptable five-month delay in the *State's* processing of permits post-assumption). Dkt. 166 at 5–6 & n.7; Dkt. 168-1 at 9–12. *Cf. NAACP v. Trump*, 298 F.Supp.3d 209, 245 (D.D.C. 2018) (staying vacatur of unlawful recission

---

[9] Florida's reliance on *National Treasury Employees Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988), Dkt. 166 at 14, is also misplaced, as in that case no party sought a return to the status quo ante. Here, vacatur (without a stay) is practical because while there is some disruption, there is also an existing Section 404 permitting process with the Corps that is known, familiar to the regulated community, and lawful, that can process pending and future permit applications. Restoring this status quo ante has been the remedy consistently requested by Plaintiffs.

of Deferred Action for Childhood Arrivals or DACA program because potential delays would expose those otherwise eligible for benefits to removal). But they cite no authority for the proposition that avoiding potential permitting delays is a "significant right."[10]

As the Court has noted, this type of disruption—delay from transfer of the program—is "inherent in the Section 404 program." Dkt. 163 at 21, 93. Congress' design provides that once assumption takes effect, the program transfers authority from the Corps to the State (a process commonly referred to as a "clean break") and contemplates a similar reversion of permitting authority to the Corps under certain circumstances. *See id.* at 21.

Moreover, there is no evidence that applicants would even face a delay comparable to the delays occasioned by Florida's assumption, *see* Dkt. 166 at 6 n.7; Dkt. 168-1 at 9, which were caused by the State's inadequate resources, staffing, and experience. The Corps, by contrast, has been administering Section 404 in Florida for decades, and has continued to do so in retained waters throughout this litigation. In addition, the Corps has determined that its resources would be better spent processing permits than attempting to craft a limited stay.

Florida and Amici also fail to square how the State's delay in undertaking the program was apparently acceptable but that any alleged delay caused by transfer to the Corps would be catastrophic. Moreover, there is no reason to conclude that Florida would expeditiously issue the 635 individual permit applications (which are more complex than general permit requests) that

---

[10] Amici's hyperbolic claims of cataclysmic economic impacts are unsupported by any evidence and are therefore unavailing. Dkt. 168-1 at 11–12. They are also undermined by the fact that the Florida Chamber of Commerce and the Association of Florida Community Developers had not participated in this case for more than seven months, *see* Dkt. 108, and that the new amici developers waited more than three years to voice any concerns over the relief Plaintiffs have sought from the start. By contrast, Collier emphasizes the need for clarity, Dkt. 167 at 2, which would be met by denying Florida's stay request.

are currently pending, according to its chart.  Florida has previously stated that it has issued only 700 individual permits in the last three years.  Dkt. 160 at 5.

It also remains unclear what proportion of the applications in Florida's program would fall under a limited stay.  Florida asserts that approximately 15% of applications might trigger a "may affect" finding but provides no factual basis for that estimate.  Dkt. 166 at 11 (citing Dkt. 166-1 at 4 (Wolfe Dec. ¶ 13)).[11]  Florida's explanation of the discrepancies in its prior estimates, *id.* at 11–12 n.11, is unconvincing and mixes apples ("may affect") with oranges ("incidental take") and bananas (Michigan's "major discharges" requiring federal review).

Collier requests that it be given the option to have Florida resume consideration of the Bellmar application under this proposal or have the Bellmar permit transferred immediately to the Corps so as not to be in regulatory limbo.  Dkt. 167 at 3.  Plaintiffs submit that immediate transfer to the Corps would remove that regulatory limbo.  Transfer is also necessary in light of the Court's denial of the Motion for a Preliminary Injunction as to the Bellmar and Kingston permits as moot in light of the Court's ruling.  Dkt. 163 at 96.  Moreover, it is plain that the Bellmar permit not only "may affect" endangered species, Dkt. 167 at 2, but that it is likely to adversely affect them and result in incidental take.

## CONCLUSION

As shown above, the Defendants do not agree with Florida that a limited stay is workable or desirable.  And for the reasons stated above, it is plain that Florida's proposal is unworkable,

---

[11] Florida attempts to explain its estimate that only 1.4% of state 404 permits involved incidental take by referring to a statement on Michigan's public website stating that approximately 1% of permits in that State "trigger EPA review."  Dkt. 166 at 12 n.11.  But Michigan's website describes the 1% of permits that require EPA review as those involving any major discharge which includes, but is not limited to, permits that may affect ESA-listed species.  *State and Federal Wetland Regulations*, Mich. Dep't Env't, Great Lakes, & Energy, https://www.michigan.gov/egle/about/organization/water-resources/wetlands/state-and-federal-wetland-regulations (last visited Mar. 6, 2024).

contrary to the ESA, and goes far beyond the Court's invitation.  Florida's proposal creates more questions than it answers, and would lead to more, not less, confusion.  In addition, Florida and Amici have not identified any deprivation of significant rights that would result absent a stay. The Court should therefore deny Florida's stay request.

To the extent that the Court nevertheless deems a partial stay warranted, Plaintiffs believe that a more workable approach consistent with the Court's opinion and governing law would be for:  (1) the Corps to receive all applications; (2) the Corps to make species effects determinations regarding each application consistent with its ESA obligations, 50 C.F.R. § 402.14(a); and (3) "no effect" applications to be processed by the State, with all other applications to be processed by the Corps, pending adjudication of Plaintiffs' remaining claims.[12] Any stay must make clear that the State has no authority to process "may affect" permits.

Dated:          March 7, 2024

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI*
Fla. Bar No. 619221
CHRISTINA I. REICHERT*
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

/s/ Bonnie Malloy
BONNIE MALLOY*
Fla. Bar No. 86109
Earthjustice

---

[12] Plaintiffs previously indicated that these determinations could be made in the first instance by the federal wildlife agency(ies), which would also comply with the ESA.  Dkt. 161 at 10.

111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

/s/ Anna Sewell
ANNA SEWELL
D.C. Bar No. 241861
Earthjustice
1001 G St., Ste 1000
Washington, DC 20001
T: 202-667-4500
asewell@earthjustice.org

*Counsel for Plaintiffs*

\* Appearing *pro hac vice*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of March 2024, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,

/s/ Tania Galloni
TANIA GALLONI
Fla. Bar No. 619221
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org

18