**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

　　　　　　　*Plaintiffs*,

　　　　v.

MICHAEL S. REGAN, *et al.*,

　　　　　　　*Defendants*.

Civil Action No. 21-119 (RDM)

———————————————

**FLORIDA INTERVENORS' REPLY IN SUPPORT OF LIMITED STAY**

———————————————

　　　　Florida Intervenors submit this reply in support of a limited stay. In their opposition (Dkt. 169), Plaintiffs contend that Florida's proposed approach for processing Clean Water Act (CWA) Section 404 permits during a period of limited stay would be "unworkable," "convoluted," "create confusion," "perpetuate violations of the ESA," and provide no "role [for NMFS] to play." Plaintiffs are incorrect on each point, as explained below. Perhaps more significantly, this reply also responds to Plaintiffs' belated acknowledgment – buried in a footnote (Dkt. 169 at 9 n.4) – about their own "confusion" regarding the New Jersey 404 program. More than mere confusion, Plaintiffs repeatedly misinformed this Court about how permit applications that "may affect" listed species are handled in New Jersey – an incorrect view that found its way into this Court's February 15 ruling and seemingly led (at least in part) to the Court's "condition" that any limited stay *must* require that all "may affect" permits be transferred to the Corps of Engineers.

　　　　Accordingly, the better course would be for this Court to remove its "may affect"/"federalize" condition for a limited stay. While Florida's motion presented a workable interim solution that was responsive to this Court's conditions for a stay, a corrected understanding

of what actually happens in New Jersey and Michigan - and what happens under 40 C.F.R. Part 233 with regard to "may affect" permit situations - strongly favors simply using the same approach for purposes of this limited stay. That ensures "federal review" (not "federalization") in a manner consistent with existing federal regulations. Not coincidentally, this is the same basic process that has already been in place in Florida for over three years. To be clear, even under this approach, Florida 404 permittees would not receive incidental take coverage during the period of limited stay because this Court's vacatur of the ITS would remain in place.[1]

As explained in the separately-filed Motion for Entry of Final Judgment (Dkt. 171), Florida Intervenors respectfully suggest that a status conference is not necessary before final judgment should be issued, nor is it necessary before a limited stay should be granted. In the event the Court decides to hold a status conference, Florida Intervenors respectfully urge the Court to set it for the earliest date possible within the next 10 days. Florida Intervenors continue to seek expedited consideration of the limited stay motion. Dkt. 166 at 19.

## I.    Plaintiffs Admit They Were Wrong About Species Reviews for 404 Permitting in New Jersey and Michigan.

At the summary judgment hearing in October 2023, this Court asked, "why not do something like the New Jersey model here"? Tr. at 107 (Oct. 19, 2023 Hr'g). Plaintiffs told this Court: "They could have done the New Jersey model." *Id.* at 131. And then they proceeded to give this Court entirely incorrect information about what the New Jersey program actually entails. In particular, Plaintiffs have told this Court that New Jersey federalizes all state 404 permits that "may affect" species. Dkt. 98 at 16 and n.12 (informing the Court incorrectly that state programs

---

[1] Florida Intervenors are permitted to file a reply in support of the limited stay motion. LCvR 7(d). To the extent this Court finds that leave is required here, Florida Intervenors respectfully seek leave to file this reply. Good cause exists because, among other things, Florida Intervenors should have an opportunity to respond to several new arguments raised by Plaintiffs and to address additional factual mischaracterizations that they have continued to make to this Court.

can "federalize state 404 permits when they may impact species (passing those permits to the Corps)," and specifically stating that "[t]his was the approach taken by New Jersey in its state program"). And, Plaintiffs previously posited to this Court a number of times that a proper remedy would be to order that "any permit that 'may affect' species" would be "processed by the Corps." Dkt. 161 at 10; *see also* Dkt. 135 at 42 (asking this Court for injunctive "order restoring authority to the Corps over permits that may affect ESA species"). In reality, no such "may affect"/"federalize" process ever existed in New Jersey or Michigan, and both Florida Intervenors and Federal Defendants previously explained that such an approach would be contrary to EPA's regulations.[2]

To be clear, permits in New Jersey that "may affect" or are "likely to adversely affect" species are not "federalized." Dkt. 166 at 3 n.2. They are simply subject to "federal review" under 40 C.F.R. Part 233 (not as a matter of Section 7 consultation), the same as they are in Florida already. Permit applications are "federalized" – transferred to the Corps for action – when EPA objects to the issuance of a permit because EPA determined that issuance of the permit would not comply with the (b)(1) Guidelines including the requirement for not causing jeopardy to a species. This concept is the same in New Jersey as it is in Florida. FWS-006144. Realizing their mistake after Florida Intervenors alerted them to it (*see, e.g.*, Dkt. 166 at 3 n.2), Plaintiffs simply dropped a footnote on page 9 of their brief, stating:

> Plaintiffs now recognize that they previously described the New Jersey approach as transferring permits to the Corps based only on a "may affect" determination, when the New Jersey process is more complex. Some confusion has arisen partly because the term "federalization" has been used to describe both when federal species determinations are required to be made by federal agencies (which USFWS

---

[2] *See, e.g.*, Dkt. 162-1, Dkt. 149 at 40 n.21; Dkt. 102 at 33-34 (explaining process applicable to all state 404 programs under 40 C.F.R. Part 233 for federalizing permits); Tr. at 101 (Jan. 30, 2024 Hr'g) (counsel for Florida addressing the Court's question about "federalize" by explaining that permits are federalized when the 404(b)(1) guidelines are "not complied with").

> does not consider to be Section 7 consultation) and when permits are transferred to
> the Corps for processing (which requires Section 7 consultation)…

Dkt. 169 at 9 n.4. It is not that New Jersey's process is "more complex"; Plaintiffs have simply operated under a total misunderstanding of federal species review procedures under 40 C.F.R. Part 233 for the duration of this litigation. Nor is it mere excusable "confusion" over the distinction between "federal review" (federal agencies giving comments to states on permits) versus "federalization" (Corps of Engineers taking the permit away from the state), as Plaintiffs have used "federalizing" correctly in other contexts.

Regrettably, Plaintiffs' mistaken view of New Jersey and their "confusion" over "federalizing" versus "federal review" found its way into this Court's February 15 ruling. *See* Dkt. 163 at 27 (stating that state programs can "federaliz[e] all state 404 permits that may impact species, as occurs in New Jersey …"); Dkt. 163 at 23 ("the State [of New Jersey] has agreed to 'federalize' – that is, pass to the FWS and NMFS for review – any permits that might affect protected species…"); Dkt. 163 at 46-47 (describing a "process for federalizing permits that may affect listed species (as was done in New Jersey)"); Dkt. 163 at 95 ("…without federalizing permits likely to adversely affect species (as in New Jersey)").

Indeed, both Plaintiffs (and this Court) treated the practice of sending "may affect" permits to FWS for "federal review" as something that was unique to New Jersey (and Michigan) and, more significantly, *as if it was a process that was not occurring in Florida*, which is wrong for all of the reasons that Florida has fully explained many times here. *See* Dkt. 166 at 9-11; Dkt. 149 at 19-21; Dkt. 149-1 at 4; Dkt. 149-2 at ¶ 24; Dkt. 102 at 21-24. And, Plaintiffs (and at times, this Court) characterized New Jersey as "federalizing" (as in, transferring permits to the Corps for

4

processing) where a project "may affect" or is "likely to adversely affect" listed species, which also is not correct.[3]

In fact, when this Court asked Plaintiffs' counsel: "How does this work in [] New Jersey and Michigan," Tr. at 21 (Oct. 19, 2023 Hr'g), Plaintiffs told this Court, incorrectly, that "any permit [in New Jersey] that may affect species would go through the federal agencies, and *therefore, they found there would be no effect on any protected species through their program*." *Id.* at 22 (emphasis added). This Court responded: "I see. Which, I take it, is – your bottom line here is that Florida or the EPA, in conjunction with [the] Fish and Wildlife [Service] *could have done either of those two things here*…" *Id.* (emphasis added). Of course, the irony here is that Florida and EPA took a more protective path by providing for federal review *of every permit* including those that *may affect* species and requiring Florida permits to adopt *any protective measures* imposed by FWS, something that is not present in the other two state programs.

Additional misinformation was provided at the January 30, 2024 TRO hearing, where this Court again asked Plaintiffs about New Jersey. The Court indicated a view that the New Jersey and Michigan programs require, for "a permit application that raises a potential risk to an endangered or threatened species, either Florida and the EPA and *the Corps have to federalize that particular application and then Section 7 applies*, or the permit applicant has to comply with Section 7." Tr. at 9 (Jan. 30, 2024 Hr'g). That is incorrect legally and factually. Yet counsel for

---

[3] *Doe I v. Exxon Mobil Corp*., No. 1:01-CV-1357-RCL, 2021 WL 1910892, at *7 (D.D.C. May 12, 2021) (noting counsel's obligation to "correct a false statement of fact to a tribunal"). It seems likely that, but for Florida Intervenors making the Court aware of Plaintiffs' mischaracterization of the New Jersey process, Plaintiffs would not have corrected it themselves. *United States ex rel. Barko v. Halliburton Co.*, 75 F. Supp. 3d 532, 545 n.56 (D.D.C. 2014), *mandamus granted, order vacated sub nom. In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) ("This Court must rely on counsel to present issues fully and fairly, and counsel have a continuing duty to inform the Court of any development which may conceivably affect an outcome." (quoting *Fusari v. Steinberg*, 419 U.S. 379, 390–91, (1975) (Burger, C.J., concurring)).

Plaintiffs continued to mischaracterize the New Jersey model as being "very different" than Florida because "[*New Jersey] was not taking over any permitting actions that would affect species*, and that's why [FWS] determined they did not need to do a biological opinion." *Id.* at 11. That, of course, is entirely wrong; yet this Court responded: "*Because theirs would all be federalized*"? *Id.* (emphasis added). Plaintiffs' counsel replied: "Correct." *Id.* Later, this Court described Florida's approach as one where Florida essentially said, "We don't want to go back to the Federal Government *like in New Jersey and federalize permits*." *Id.* at 60 (emphasis added). That, too, was wrong.

Coincidentally, Plaintiffs' counsel was also wrong on virtually every other point made in the "How does this work in New Jersey and Michigan" colloquy with the Court at the October 2023 hearing (as found at Tr. at 21-23). Counsel for Plaintiffs told the Court that "Michigan has its own state Endangered Species Act program, *which is what it uses to ensure no jeopardy at the permit level*." *Id.* at 21-22 (emphasis added).[4] This is incorrect. Michigan satisfies the "no jeopardy" requirement the same way that Florida and New Jersey do; that is, by virtue of the requirement under the federal "review" procedures in 40 C.F.R. Part 233 providing that no state 404 permit would be issued that *jeopardizes* a species because any such permit must be *objected* to (and *if* the objection is not resolved by avoiding jeopardy, the permit must be *federalized* by transfer to the Corps).[5]

_____

[4] Florida has a robust state ESA. *See* Fla. Stat. § 379.2291 ("The Florida Threatened and Endangered Species Act").

[5] Whether a permit application would *jeopardize* a listed species (per the Part 233 objection/federalization process) is a different inquiry from whether federal approval of a state program "may affect" listed species for purposes of triggering Section 7 consultation at the assumption stage. *Cf.* Dkt. 163 at 22-23 n.3 ("The question whether a State has adequate authority to ensure that no state-issued permit causes jeopardy, however, at least arguably differs from the

Next, counsel for Plaintiffs told this Court that the federal agencies "didn't do consultation under [Section 7 of] the Endangered Species Act" when approving the Michigan program, to which this Court asked, "I take it that was because at that point in time the EPA was of the view that the assumption authority was nondiscretionary?" Tr. at 22. Counsel for Plaintiffs incorrectly responded, "Right, Your Honor." *Id.* That, too, was incorrect and unsupported. EPA approved Michigan's 404 program in 1984. Nothing in the record before this Court suggests that consultation did not occur because "assumption authority was nondiscretionary." *Id.*[6] Instead, as explained in public records, FWS long ago advised EPA that "Michigan's original assumption, during 1984, of the CWA section 404 permit program should have been subjected to formal consultation with the FWS, pursuant to Section 7 of the ESA (reiterating positions that the FWS had stated in letters dated April 8, 1983, and August 19, 1983). At that time, EPA had determined that approval of

_____

question whether the federal action—here, the approval of the assumption application—*is likely to jeopardize a listed species*.") (emphasis added).

[6] Indeed, whether "assumption authority" is "discretionary" ("may" approve) or "nondiscretionary" ("shall" approve) is beside the point on the issue of whether Section 7 is triggered. EPA clearly has a *nondiscretionary* duty to approve a state 404 program that meets the criteria found in Section 404. 33 U.S.C. § 1344(h)(2)(A) (providing that EPA "shall" approve a state program that meets the required criteria). The question for triggering Section 7 consultation is different; it is whether EPA has "discretion" to consider impacts to listed species as part of the state assumption process – a point that is made clear in the Supreme Court's decision in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007). This Court expressed severe skepticism about Florida's (and Federal Defendants') position on this point at the January 30, 2024 hearing. Tr. at 42 (Jan. 30, 2024 Hr'g) ("you're wrong when you say the Supreme Court has said that Section 7 applies"); Dkt. 163 at 22-23 n. 3. In the February 15 ruling, however, the Court opted to defer taking up that question. Dkt. 163 at 22-23 n.3. If the Court does not agree that Section 7 is triggered under the rationale of the Supreme Court's decision in *National Association of Home Builders*, *and if this Court is right*, then ESA Section 7 consultation is *not* triggered and any state can simply take the easier path blazed by New Jersey and Michigan – one that looks very similar to Florida's without, of course, the preparation of a programmatic BiOp/ITS, supplementary technical assistance process to provide a more robust level of species review and protection, and the benefits of Section 7 consultation (including incidental take liability coverage pursuant to Section 7(o) of the ESA).

Michigan's section 404 program was not a 'federal action' and, therefore, EPA did not invoke Section 7's consultation requirement."[7] In other words, as far back as 1983, the position of FWS has been that Section 404 assumption triggers formal consultation (something Florida and EPA agreed should occur). And FWS kept to that position when it told EPA that it should enter formal programmatic consultation when approving New Jersey's program as well (though EPA did not agree and no formal consultation occurred).

Third, counsel for Plaintiffs incorrectly told this Court that, for Michigan, "any take liability coverage is due to their own already preexisting agreement on their state program…" Tr. at 22. Incidental take liability coverage is <u>not</u> provided to Michigan 404 permittees, because Michigan's program did <u>not</u> undergo *formal programmatic consultation* and, thus, a BiOp/ITS was not prepared.[8] There is simply no basis for Plaintiffs' alternate theory as to that question.

The upshot of Plaintiffs' acknowledgment is that this Court should, at a minimum, reconsider relevant aspects of the February 15 ruling and order, at least insofar as it relates to the pending motion for limited stay. This Court's "may affect"/"federalize" condition for a limited stay has no basis in actual practice in New Jersey or Michigan or under Part 233. A change in this

---

[7] EPA, Final Report - Results of the U.S. Environmental Protection Agency Region 5 Review of Michigan Department of Environmental Quality's Section 404 Program, at 91 n.43 (May 2008).

[8] Counsel for Plaintiffs repeated this incorrect information at the January 2024 TRO hearing. Tr. at 12-13 (Jan. 30, 2024 Hr'g) (advising this Court incorrectly that, through Michigan's ESA "Section 6" agreement with the federal government, Michigan has "already, in some sense, an assumption in Michigan of [ESA] authority). ESA Section 6 allows for "cooperative" agreements with federal funding to support state species protection programs. 16 U.S.C. § 1535. Florida entered a Section 6 cooperative agreement with U.S. Fish and Wildlife Service *over four decades ago*. *See* Memorandum of Understanding between FDEP-FWS-FWC at 4 (EPA-HQ-OW-2018-0640-0016-A2). Many other states have those agreements as well. It is not clear why Plaintiffs sought to interject that point into the case; nonetheless, contrary to counsel for Plaintiffs' explanation to this Court, ESA Section 6 has nothing to do with take liability. *See* 16 U.S.C. § 1535(c)(1)(ii).

Court's "conditions" for a limited stay is due. *Franklin-Mason v. England*, No. 96-2505JMF, 2005 WL 1804426, at *1 n.1 (D.D.C. Aug. 1, 2005) ("Indeed, the D.C. Circuit has suggested that courts have not only 'the power' but also 'the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake.'") (quoting *Howard Sober, Inc. v. I.C.C.*, 628 F.2d 36, 41 (D.C. Cir. 1980)).

Florida Intervenors now turn to Plaintiffs' main arguments in their response brief; namely, that Florida's proposed approach for the period of a limited stay would be "unworkable," "convoluted," "create confusion," "perpetuate violations of the ESA," and provide no "role [for NMFS] to play." As addressed below, Plaintiffs are incorrect on each of these points as well.

## II.    Florida's Proposal Is Not "Unworkable," "Convoluted," or Likely to "Create Confusion."

In its motion, Florida Intervenors proposed an approach that aligns with this Court's condition that any permit that "may affect" listed species must be transferred to the Corps. Notwithstanding "partial assumption" and the concerns raised above about whether such a condition is necessary (in light of Plaintiffs' acknowledgment in their footnote 4), Florida remains committed to administering the program during a period of limited stay under that condition, if the Court requires it.

However, it does seem clear that such a condition should be lifted for the reasons explained. Thus, Florida's second proposed option – i.e., use the federal review process to ensure that "may affect" permits undergo review by FWS and NMFS, which provides for federalization in the same manner as used in Michigan and New Jersey in the rare circumstance that the federal agencies make a "jeopardy" determination and the state refuses to deny the permit (which is the same manner also already administered in Florida). Contrary to Plaintiffs' assertions, that approach for processing 404 permits during a limited stay is absolutely workable and clearly set forth in existing

program documents. Indeed, with a proper understanding of what happens in New Jersey and Michigan, it should be abundantly clear now to even the Plaintiffs that Florida's proposed approach aligns with those programs, which means the approach is necessarily workable and understood by all stakeholders, for all of the reasons already explained.

### III.    Florida's Proposal Does Not "Perpetuate Violations of the ESA."

Contrary to Plaintiffs' contention (Dkt. 169 at 8), Florida's proposed approach does not "perpetuate violations of the ESA." They claim Florida would be "violating" the ESA because "Florida's proposal provides that state or federal agency may make a 'may effect' [sic] determination but does not impose a duty on any of them to make that determination…." Dkt. 169 at 8. Plaintiffs' position is unreasonable. FWS receives a copy of *all 404 permit applications* in Florida (not just the "may affect" permits). Dkt. 149-3; *see also* Florida 404 Handbook, Section 5.2.3 (EPA-HQ-OW-2018-0640-0002-A20 at 23); BiOp (EPA-HQ-OW-2018-0640-0642) at 11-12, 19-20, 67-68; *compare* New Jersey MOA (AR FWS-001644) at III.A ("The NJDEP staff will screen [] Statewide general permit[s]…in locations with the potential for occurrences of federally-listed species or designated critical habitat…." (emphasis added)). Florida's 404 Handbook expressly explains in Section 5.2.3:

> The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when the Agency determines that the project may have the potential to affect listed species.

Moreover, the FWS Biological Opinion, which Florida remains committed to, expressly provides that FDEP will send all permit applications to FWS. BiOp at 11-12. As Florida Intervenors have extensively explained already, the species review process under the Florida 404 program is intentionally equivalent to the process that would otherwise apply in a Corps-led

program. Dkt. 149 at 20-21; Dkt. 149-3. And all Florida permit applications are available for review on-line by <u>everyone</u>, not just agencies.

Of course, here, we are in a context where this Court has already ruled and vacated approval of the program, so the question is whether, as a function of this Court's equitable discretion to fashion a stay of its vacatur order, this Court may allow the program to remain in place in some manner. Requiring Florida to follow this process will provide adequate assurances to this Court that species are protected while Florida continues to administer the program (*albeit without incidental take liability coverage for state permittees*).

## IV. Florida Fully Addresses NMFS' Role During the Limited Stay.

Plaintiffs are also wrong that "Florida makes no provision for what role NMFS would play in a limited stay." As noted above, the Florida 404 Handbook already provides for NMFS review of Florida 404 permits. Florida has a long history of coordinating with NMFS on state permits and remains committed to ensuring that NMFS has every opportunity for reviewing Florida 404 permits. Beyond that, Florida's 404 program does not apply to coastal waters, as all such waters are retained by the Corps of Engineers. Thus, NMFS involvement is relatively infrequent for Florida 404 permits. Last, EPA and NMFS were engaged in Section 7 consultation regarding Florida's program but Florida's current understanding is that this consultation has recently ceased in light of this Court's vacatur order. Florida has no qualms with making sure NMFS has a copy of all permit applications.

## CONCLUSION

At this moment, a host of permit applications – many squarely in the public interest – are held in a state of unconscionable limbo by virtue of this Court's vacatur order. Florida 404 permittees who have been in the queue for many months or even years are faced with a choice of

restarting a permit process with the Corps (likely from scratch at tremendous cost and delays) or awaiting some reprieve from this Court. Florida Intervenors respectfully seek relief in accordance with the Motion for Limited Stay.

Florida is prepared to proceed in accordance with either of the two options proposed in the motion, though the State would respectfully request that the "may affect"/"federalize" condition set by this Court should be reconsidered for the reasons explained herein. If this Court lifts the condition, the second approach – the one consistent with existing federal review procedures and the *actual* permit practices in New Jersey and Michigan – would serve as the better course during the period of limited stay.

Dated:  March 11, 2024                                     Respectfully submitted,

                                                           BAKER BOTTS L.L.P.


                                                           */s/ Jeffrey H. Wood*
                                                           Jeffrey H. Wood (D.C. Bar No. 1024647)
                                                           700 K Street, NW
                                                           Washington, D.C. 20001
                                                           Phone: (202) 639-7700
                                                           jeff.wood@bakerbotts.com

                                                           Lily N. Chinn (D.C. Bar No. 979919)
                                                           101 California Street
                                                           San Francisco, CA 94111
                                                           Phone: (415) 291-6200
                                                           lily.chinn@bakerbotts.com

                                                           Aaron M. Streett (TX Bar No. 24037561)
                                                           Harrison Reback (TX Bar No. 24012897)
                                                           (*pro hac vice*)
                                                           910 Louisiana Street
                                                           Houston, TX 77002-4995
                                                           Phone: (713) 229-1234
                                                           aaron.streett@bakerbotts.com
                                                           harrison.reback@bakerbotts.com

## CERIFICATE OF SERVICE

I hereby certify that on this the 11th day of March 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

13