IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHAEL S. REGAN, *et al.*, <br><br> *Defendants*. | Civil Action No. 21-119 (RDM) |

_____

**FLORIDA INTERVENORS' MOTION FOR STAY OF VACATUR ORDER PENDING APPEAL (EXPEDITED RULING REQUESTED)**
_____

Pursuant to Federal Rule of Appellate Procedure 8, the State of Florida and the Florida Department of Environmental Protection (FDEP) (collectively Florida Intervenors) respectfully request an order staying, *in full*, this Court's February 15, 2024 order vacating the Environmental Protection Agency's (EPA's) approval of Florida's Clean Water Act (CWA) Section 404 assumption application, pending resolution of Florida Intervenors' appeal to the United States Court of Appeals for the District of Columbia Circuit.

Over two months ago, this Court rejected Florida Intervenors' request in remedy briefing for a stay of any *eventual* vacatur order and, after issuing the vacatur order, the Court permitted Florida Intervenors to seek *only* a "limited stay" of the vacatur order subject to specific Court-imposed "conditions" for any such stay. Dkt. 163 at 96. Via motion filed on February 26, 2024, Florida Intervenors promptly sought the conditional limited stay that this Court said it would be willing to consider. Dkt. 166. Florida Intervenors repeatedly urged a swift ruling on the stay

motion. The Court did not rule until April 12, 2024, when it denied Florida's limited stay motion. Dkt. 184. On the same date, this Court dismissed Counts 1, 2 and 5 as prudentially moot, and recognizing that "Florida should be allowed to appeal" the February 15 ruling "without delay," Dkt. 183 at 25, and that Florida has "a legitimate and substantial interest in obtaining prompt appellate review of a decision and order that set aside a program to which it has devoted extensive time and effort," *id.* at 26, this Court entered partial final judgment as to Counts 1-6 and 8-13 pursuant to Rule 54(b). Dkt. 184.

Florida Intervenors have filed a Notice of Appeal. Dkt. 185. Given the urgency of the situation, Florida Intervenors submit this request for a full stay of the Court's vacatur order pending appeal and request a ruling on this motion within seven (7) days (by April 23, 2024), at which time Florida Intervenors would intend to seek a full stay of this Court's vacatur order from the D.C. Circuit. Florida Intervenors sought the position of the other parties on Florida's request for a full stay and for expedited ruling from this Court. Plaintiffs oppose Florida's request for a stay pending appeal and for a decision within 7 days, which Plaintiffs argue would not allow Plaintiffs adequate time to respond. Plaintiffs aver that they requested, but did not receive, any new information from Florida that would support a request for a stay or for urgent relief. Plaintiffs therefore request that they be provided at least 10 days to respond once they have seen the motion. Federal Defendants reserve their position until after they review this motion.

I.  **LEGAL STANDARD**

This Court has authority to stay its vacatur order pending appeal. *NAACP, v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018) ("Under Federal Rule of Civil Procedure 62(c), district courts generally have the authority to stay their orders pending appeal."). Courts "may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities

2

of the case suggest that the status quo should be maintained." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844–45 (D.C. Cir. 1977).

Courts consider four factors when deciding whether to grant a stay of a vacatur order pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In recent cases, courts in this Circuit continue to consider these factors on a "sliding scale," whereby "a strong showing on one factor could make up for a weaker showing on another." *NAACP*, 321 F. Supp. 3d at 146. Accordingly, a court may issue a stay pending appeal "if a serious legal question is presented, little if any harm will befall other interested persons or the public, and denial of the order would inflict irreparable injury on [movants]." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 560–61 (D.D.C. 2018) (cleaned up) (citing *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844).

## II.     ARGUMENT

### A.  Likelihood of Success on the Merits

In the D.C. Circuit, to satisfy the "likelihood of success" factor, the movant must show only "that the issue on appeal presents a 'serious legal question' on the merits." *Cigar Ass'n of Am.,* 317 F. Supp. 3d at 560 (citing *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844; *see also Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 539 F. Supp. 3d 211, 216 (D.D.C. 2021) ("[I]n this Circuit a movant's failure to demonstrate a likelihood of success on the merits does not preclude a stay if they have raised a 'serious legal question on the merits.'" (internal citations omitted)). Courts may look to "the complexity of the issues raised by [Movants] on

appeal" to determine whether the "case presents serious legal questions on the merits." *Cigar Ass'n of Am.,* 317 F. Supp. 3d at 562. Under this standard, Florida Intervenors easily demonstrate a substantial likelihood of success on appeal. Serious legal questions exist concerning several central issues. These reasons, taken alone or together, demonstrate a substantial likelihood of success for purposes of this stay factor.

### i. This Court's Decision Conflicts with *Cooling Water*

Florida Intervenors have a substantial likelihood of persuading the Court of Appeals that this Court erred by rejecting Judge Lohier's unanimous opinion in *Cooling Water Intake Structure Coal. v. EPA,* 905 F.3d 49, 61, 71-78 (2d Cir. 2018), as well as distinguishing it on its facts.

In *Cooling Water*, the Second Circuit upheld a programmatic biological opinion/incidental take statement (BiOp/ITS) used in an analogous circumstance (i.e., a programmatic BiOp/ITS that applied to EPA's adoption of a program that allowed states to issue permits where species impacts would be addressed through state permits on a site-specific basis with "technical assistance" from federal agencies and incidental take coverage for state permittees). This Court, however, found that "*Cooling Water* is at odds with the statute, regulations, and caselaw." Dkt 163 at 66. When a district court disagrees with the decision of another court addressing a "serious legal question," especially where that disagreement is with a unified panel of a court of appeals, district courts have found that the likelihood of success factor favors a stay. *See Cigar Ass'n of Am.,* 317 F. Supp. 3d at 561-62 (holding that low likelihood of success on the merits was not fatal to motion for stay pending appeal, where issues being appealed presented complex and serious legal questions). This Court's fundamentally different legal approach from that taken by the Second Circuit shows "there is potentially persuasive authority for [Florida's] legal position" and the issues being appealed "present[] serious legal questions on the merits," which favors granting a stay pending appeal.

4

*Cigar Ass'n of Am.,* 317 F. Supp. 3d at 561-62 (internal citations omitted). Florida Intervenors and Federal Defendants both relied heavily on the Second Circuit's analysis and holding in *Cooling Water* to defend the agency actions at issue in this litigation. *See, e.g.,* Dkt. 46 at 14; Dkt. 81 at 29.

The Second Circuit explained the ESA take liability framework in the programmatic context and addressed FWS's *requirement* under Section 7(b)(4) to "provide an [ITS]" and Section 7(o)(2)'s broad coverage for any "taking that complies with measures specified in an ITS." *Cooling Water*, 905 F.3d at 61, 71-78. The Second Circuit also discussed the programmatic BiOp/ITS and noted that quantification of incidental take would be addressed as part of the "site-specific permitting process." *Id.* at 63. Under that BiOp/ITS, the ESA's incidental take exemption extends to "any take incidental to the operation of a CWIS permitted under the Rule *through the implementation process*" if a permittee complies with the species-related provisions "as reflected in the permit." EPA-HQ-OW-2018-0640-0688-A5 at 75-76. And, as noted previously, this issue of extending take liability coverage to state permittees was briefed to the Second Circuit. EPA-HQ-OW-2018-0640-0673 at 11 n.23. The Second Circuit specifically noted that the CWIS Rule itself did not "independently authorize take," and the court cited the portion of the CWIS Rule preamble found at "79 Fed. Reg. at 48,382," where EPA explained FWS' commitment as part of the technical assistance process to provide the reasonable and prudent measures necessary for authorizing take. *Cooling Water*, 905 F.3d at 75 n.16.

The Second Circuit correctly upheld the 316(b) BiOp/ITS, expressly holding that the BiOp is "consistent with the ESA and its implementing regulations," that the ITS is also "consistent with the ESA," that the "EPA and the Services acted within, and did not unlawfully delegate its statutory authority by including provisions in the [316(b) rule] that allow the Services to advise the EPA and [States] on the site-specific impacts of [cooling water structures on listed species]," and that

5

"the EPA and the Services did not violate the ESA by engaging in formal consultation on the proposed rule." *Id.* at 84.

This Court also disagreed with the Second Circuit's reliance on the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013). Both Florida and Federal Defendants have relied on the Eleventh Circuit's decision in *Navy* to support the flexible programmatic consultation approach here. *See* Dkt. 100 at 82; Dkt. 102 at 25 n.13; Dkt. 106 at 43. This Court's view of *Navy* is, at least, debatable, which further supports a stay pending appeal. 733 F.3d at 1121 (finding that a programmatic BiOp/ITS does *not* need to ensure that review of species impacts is "coextensive in scope with the entire action," and explaining that "[i]t is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate").

While this Court also distinguished the current facts from the situation in *Cooling Water*, there are serious contrary arguments that make it at least debatable whether the state 404 and state 316(b) contexts are, in fact, distinguishable such that a BiOp/ITS in one context cannot serve as an exemplar for the other. Dkt. 163 at 64. As Florida Intervenors and Federal Defendants have consistently argued, the BiOp/ITS at issue in *Cooling Water* closely mirrors the Florida 404 program BiOp/ITS – indeed, that was *intentional*, as this Court itself has recognized. Dkt. 163 at 66 ("[T]he programmatic BiOp and ITS of *Cooling Water* are similar to those now before the Court."). In virtually all significant respects, the Florida 404 BiOp/ITS mirrors the 316(b) BiOp/ITS. For instance, the *Cooling Water* BiOp/ITS involved a federal water discharge permit program implemented *in 47 states through state-issued permits* with ongoing federal review procedures very similar to those at issue here. And the *Cooling Water* BiOp/ITS employed a "technical assistance process" – with features going above and beyond what is otherwise required

6

for mere CWA compliance purposes – for ensuring that state permits were adequately protective of listed species *as determined by federal agencies*, with federal (EPA) oversight on a permit-by-permit basis, as well as incidental take coverage for state permittees who complied with the ITS terms and conditions. These are all of the same basic features of the Florida 404 BiOp/ITS.

This Court's rationale for distinguishing these two situations is incorrect, or at least debatable. First, this Court's "rule promulgation/application approval" distinction is not relevant to whether consultation is triggered under Section 7 of the ESA and the ultimate form of that consultation. Section 7 consultation is triggered based on whether an "***agency action***" (which includes both rules and approval of program applications) may affect listed species (informal) and/or "are likely to adversely affect" listed species (formal). 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that ***any action authorized, funded, or carried out by such agency*** (hereinafter in this section referred to as an "***agency action"***) is not likely to jeopardize the continued existence of any endangered species or threatened species...") (emphasis added).  Here, it is undisputed that EPA's review of Florida's Section 404 program application appropriately triggered Section 7 formal consultation. And because EPA was reviewing a program where species impacts would be determined on site-specific actions under the program, EPA and FWS properly engaged in programmatic formal consultation. Whether an "agency action" is "carried out" via "rule promulgation" or "application approval" (or via other means for that matter) is simply not a relevant distinction. Second, this Court distinguished *Cooling Water* based on the notion that "the requirements of the 316(b) technical assistance process were codified as part of the rulemaking, creating ***legally binding responsibilities for all parties***," whereas the "'Final Notice' published in the Federal Register approving Florida's program makes no mention of the technical assistance process or any of its

7

procedures.…" Dkt. 163 at 65 (emphasis added). This, too, is not a relevant distinction, nor is it correct. As previously briefed, the Florida 404 species review process was comprehensively described in the State's program application including (among other places) in the MOU entered between FDEP, FWS, and the Florida Fish and Wildlife Conservation Commission (EPA-HQ-OW-2018-0640-0016-A2); and in the Florida 404 Handbook (HQ-OW-2018-0640-0002-A20 at 6, 23-24). EPA reviewed the anticipated technical assistance procedures described in the Florida 404 application documents. Ultimately, this process was integrated with the technical assistance process established in the BiOp/ITS. FDEP and FWS *must and do* participate in the species review process as part of the Florida 404 program, including the technical assistance process. *See* Dkt. 127-1 at 3-4 (reciting obligations to participate in species review process). It is a binding process.

### ii. This Court's interpretation of Section 7 of the ESA, at a minimum, raises serious legal questions.

This Court's approach to Section 7 consultation is also in conflict with the text of ESA Section 7.[1] At the threshold level, ESA Section 7(a)(2) applies to "any action authorized" by a federal agency, 16 U.S.C. § 1536(a)(2), which encompasses EPA's approval of a state program. Where that agency action is likely to adversely affect but not jeopardize listed species or adversely modify critical habitat, Section 7(b)(4) provides that FWS/NMFS "shall provide" a written incidental take statement to not just "the Federal agency" (here, EPA) but also to "the applicant concerned" (here, FDEP as the applicant for EPA approval). 16 U.S.C. § 1536(b)(4)(C). That written statement must, among other things, "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or

---

[1] In its ESA analysis, this Court focused on the species "conservation" aspects of the ESA while omitting any mention or discussion of Section 2(c) of the ESA, which expressly recognizes congressional policy that "[f]ederal agencies shall ***cooperate with [s]tate and local agencies*** to resolve water resource issues in concert with conservation of endangered species." 16 U.S.C. § 1531(c)(2) (emphasis added).

8

applicant (if any), or both.…" *Id*. § 1536(b)(4)(C)(iv). In turn, Section 7(o)(2) provides incidental take coverage in broad fashion for "any taking" resulting from that action so long as it "is in compliance with the terms and conditions specified in [FWS's] written statement.…" *Id*. § 1536(o)(2). This is the textual basis for extending incidental take coverage to state permittees in this context.

Rejecting that interpretation, this Court adopted Plaintiffs' view that the *only* avenue for incidental take liability coverage for state 404 permittees is an incidental take permit under ESA Section 10(a)(1)(b), 16 U.S.C. § 1539(a)(1)(b). But that narrow view ignores the broad text of ESA Section 7(o)(2) exempting "any" incidental take in compliance with terms and conditions in an ITS. *See* 50 C.F.R. § 402.14(i)(5); *see also* EPA-HQ-OW-2018-0640-0660-A1 at 6-7 (explaining why incidental take coverage extends to state permittees in this context). While FWS "shall" issue an ITS, FWS "may" issue an ITP. In fact, an ITP is a potential avenue for obtaining take liability protection where no federal involvement exists that would otherwise ensure that a private activity does not jeopardize listed species; of course, in the 404 assumption context, there is *extensive ongoing federal involvement* in the form of federal approval of the state 404 program application, along with continuous federal review of impacts to species on a permit-by-permit basis and continuous EPA oversight on a permit-by-permit basis. In a context with such extensive ongoing federal involvement, Section 7 is the better fit.

### iii. Plaintiffs lack standing for these claims.

Florida Intervenors have a substantial likelihood of success in showing that Plaintiffs lack Article III standing. Dkt. 102 at 13-15, 27-41; Dkt. 107 at 5-19. At a minimum, whether Plaintiffs have standing for these claims raises serious legal questions. Appellate courts frequently review standing to determine the "success on the merits" prong. *See, e.g., I.N.S. v. Legalization Assistance*

9

*Project of L.A. Cty. Fed. of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, Cir. J., in chambers) (granting application to stay district court order pending final disposition by the Court of Appeals because the plaintiff likely lacked standing); *Tex. Dem. Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020) (discussing standing in the context of likelihood of success on the merits); *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 323 (D.D.C. 2018) (same). As argued thoroughly in prior briefing, Plaintiffs lack Article III standing in this case. Florida Intervenors are substantially likely to succeed in showing that the District Court ignored good reasons to deny standing for these claims and that the Court erroneously based standing injury on facts arising after the complaint was filed. Plaintiffs have not shown standing as to their substantive claims, nor have they carried their burden of proving standing for procedural claims built on theories of informational injury. Though this Court rejected the Article III-based challenges raised by Florida Intervenors, the substantial legal questions involving standing further support a stay.

> **iv. Vacatur is an Improper Remedy in this Cooperative Federalism Context Where the Federally-Approved State Program Has Been in Place for Over Three Years with Thousands of Permit Actions Completed and Thousands Pending.**

Whether this Court should have vacated the program also raises serious legal questions. This Court conceded that it was "difficult to make a definitive determination" on whether vacatur was appropriate, yet the Court still determined that vacatur of the entire Florida 404 program was the proper remedy. Dkt. 163 at 95. Under *Allied Signal*, a court must assess "the seriousness of the order's deficiencies" and the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal citation omitted). Here, both factors strongly favored remand without vacatur. Despite the fact that the influence of the BiOp/ITS on "the overall Florida assumption program is far from clear," this Court still decided to impose the most extreme remedy possible: vacating the

10

entire program, not just vacating and/or remanding the allegedly flawed BiOp/ITS. Dkt. 163 at 94. This remedy not only misapplied the *Allied-Signal* factors, but this Court's underlying analysis for vacatur was premised on a misunderstanding of other state 404 programs. Vacatur places Florida on unequal footing with other states.

For the litany of reasons already provided to this Court, Florida Intervenors have demonstrated that they are likely to succeed on the merits, or at a minimum, that the appeal raises a "serious legal question on the merits." *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844.

### B. Irreparable Harm

"Where a party can demonstrate 'probable success on the merits," the party need only establish a "possibility of irreparable injury.'" *Fund For Animals v. Norton,* 281 F. Supp. 2d 209, 219 (D.D.C. 2003) (internal citations omitted). Here, Florida Intervenors easily satisfy the irreparable harm requirement. As discussed in earlier briefs and as supported by the multiple declarations submitted by the Florida Intervenors over the course of this litigation,[2] vacatur of the Florida 404 program has caused irreparable harm and will continue to do so.

First, the State of Florida has experienced and continues to experience irreparable harm to the State's sovereign interests in the conservation and management of water resources and wildlife – both areas of traditional state responsibility. *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 161 (2001) (recognizing "States' traditional and primary power over land and water use"). The vacatur order pulled the plug on Florida's 404 program governing water resources throughout the State of Florida after that program had been firmly in place *for over three years*, with thousands of permitting actions throughout the state*.* Courts have frequently held that the loss of state sovereignty in cooperative-federalism programs constitutes irreparable

---

[2] *E.g.,* Dkt. 149-1, Dkt. 160-1, Dkt. 166-1.

harm. *See e.g., Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of "state sovereignty and state management of land" as an irreparable harm); *Kentucky v. Biden*, 23 F.4th 585, 611–12 n.19 (6th Cir. 2022) (discussing "invasions of state sovereignty" as harms that cannot be monetarily addressed); *West Virginia v. U.S. EPA*, 669 F. Supp. 3d 781, 807 (D.N.D. 2023) (holding that "the loss of the State's sovereignty is an irreparable harm"); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (holding that an "increase in [federal] CWA jurisdiction by 2.84 to 4.65% annually" would cause "[l]oss of sovereignty [which] is an irreparable harm."). In *Georgia v. Pruitt*, the court specifically found that a state losing sovereignty over 1.81% of its waters was irreparable harm. 326 F. Supp. 3d at 1367. Losing primary state responsibility over all assumed waters to the Corps of Engineers, after more than three years of state program implementation, causes Florida a unique, irreparable, and ongoing injury to its sovereign interests.

Second, although the Court's February 15 vacatur does not retroactively impact existing Florida 404 permit holders, it does impede FDEP's authority to enforce the 404 program for all permittees. At the time of the vacatur, FDEP was forced to cease operating the Florida 404 permitting program, which included the immediate pause of investigations for any potential violations of the 404 program. It is unclear whether FDEP has legal authority to take actions to ensure compliance and/or pursue enforcement actions for any 404 violations in Florida. This confusion is even more pronounced where, as a result of this Court's vacatur order, FDEP appears to have no enforcement authority over potential violations of 404 permits issued by FDEP.

Even if the Jacksonville District of the Corps has added a handful of new employees recently, the District serves four separate states and territories with a mission that encompasses much more than just processing 404 permits in assumable waters within Florida. Nor do those

staffing numbers compare favorably to the more than 300 FDEP certified wetlands evaluators, compliance and enforcement personnel, and other FDEP staff working on the Florida 404 program. These impacts to Florida's ability to process permits for water resources, ensure compliance with those permits, and enforce violations within its boundaries is an irreparable harm that cannot be monetarily addressed.

Third, over 1,000 permit applications were pending in the FDEP 404 process and as a result of the vacatur order these projects face delay, regulatory limbo and/or will be forced to start their 404 application process essentially from "square one" with the Corps. Indeed, over the last two months since vacatur of the program, it is expected that at least fifty state 404 individual permits and modifications would have been issued by FDEP.[3] Florida Intervenors' prior briefs recount the state's extensive work over of the course of several years to prepare and apply for assumption of the Section 404 permit. Dkt. 37 at 20-37; Dkt. 102 at 14-36. Among the over 1,000 permit applications that were pending in Florida at the time of the vacatur order, many involved high-value projects including everglades restoration work, transportation projects, grid reliability projects, new medical facilities, new school projects, sewer system improvement projects, housing projects, and over 200 other public projects. This means the State of Florida has lost the benefit of these projects moving forward in a timely manner, has lost the time and resources expended on the processing of more than a thousand 404 permits, and has lost the additional time expended applying for and generally administering the 404 program in Florida.

---

[3] In the two-year period immediately preceding the February 15 vacatur order, FDEP issued 634 individual final permits or individual permit modifications under the 404 program. This averages to approximately 26 individual permits or permit modifications issued each month by FDEP and does not include the numerous general permits or other 404 permitting actions taken by FDEP. Accordingly, in the two months since vacatur, it is likely that at least 50 individual permits or permit modifications would have been issued by FDEP.

13

Fourth, there are significant fiscal impacts to the State of Florida arising from the vacatur of EPA's approval of Florida's 404 program. Florida expended substantial resources applying for and obtaining approval of its 404 program application. After EPA's approval, Florida expended even more resources on staffing, organizing, and implementing the 404 program.

Fifth, vacatur also eliminates critical efficiencies gained in the 404 permitting process in Florida. One of the central rationales behind seeking 404 assumption was the regulatory efficiencies to be gained from coordinating the issuance of Florida Environmental Resource Permit permits and 404 permits. For many years prior to assumption of the program, Florida and its citizens experienced significant permit delays, high costs, inefficient processes, and other challenges with the Corps' administration of the Section 404 program. Vacatur resurrects those concerns.

### C. Balance of Harms and Public Interest

When assessing whether to grant a stay, courts frequently combine their analysis of the third and fourth factors. "Before issuing a stay, it is ultimately necessary ... to balance the equities—to explore the relative harms … as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (citing *Barnes v. E–Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)). As discussed above, many of the irreparable harms arising from the vacatur order are inflicted on citizens in Florida who are permittees, permit applicants, and potential permit applicants, as well as the beneficiaries of those projects such as residents in senior living communities or affordable housing projects, commuters who would experience reduced traffic congestion and safer roads and sidewalks from proposed projects, communities who would benefit from post-hurricane restoration work, and many other beneficiaries of projects that are currently on hold because of the vacatur order. The disruption of

the state 404 permit process for over a thousand pending applicants, the regulatory uncertainty for all current and future permittees, and the interruption of the state's authority to implement the program will continue to severely harm the public. One of the most significant impacts, of course, is the prolonged postponement of as many as a thousand public projects including environmental restoration projects, roads, bridges, hospitals, housing, schools, and military projects. The vacatur order necessarily requires that *all of these projects* – many of which were far into the lengthy 404 permit process in Florida – to return to square one by refiling their applications with the Corps of Engineers. Recent statements by the Corps, which are not consistent with on-the-ground realities or past experiences, give little comfort to Florida permittees. Permit applicants for these projects have expended significant resources and time in submitting permit applications and responding to additional FDEP requests for information, and with Florida stripped of its authority, these applicants are without reprieve. The harm caused by depriving the public of the benefits of these projects and derailing permit applicants' projects strongly favor a stay.

Absent a stay, the public will also be harmed by the absence of FDEP's authority to enforce the 404 program. As discussed above, Florida's authority to pursue ongoing investigations over non-compliance is hindered. The public interest clearly supports the State of Florida administering and enforcing its Section 404 program, at least for the pending of the appeal of these significant legal questions.

Most significantly, as discussed above, the vacatur order irreparably harms Florida's sovereign interests in the management and conservation of water resources and wildlife in the state, all of which fall squarely in the traditional authority of the states, not the federal government. *Akiachak Native Cmty.*, 995 F. Supp. 2d at 17. Congress made clear that cooperative federalism is at the heart of the CWA, which is why Congress designed its key permit programs to be

implemented and enforced primarily by states. The public benefits when federal and state agencies work cooperatively to achieve shared environmental goals, as has been the case with FDEP, EPA, FWS, FWS, and other agencies working cooperatively to successfully implement the 404 program in Florida.

### III.     CONCLUSION

For the foregoing reasons, Florida Intervenors respectfully request an expedited order granting a full stay of the February 15, 2024 vacatur order pending resolution of their appeal. To the extent this Court intends to deny this motion for a full stay (consistent with its prior rulings on Florida's remedy and limited stay requests), Florida Intervenors respectfully request that such a denial be rendered within seven days (by April 23, 2024), at which time Florida Intervenors intend to seek a full stay of this Court's vacatur order from the Court of Appeals.

Dated:  April 16, 2024                                                  Respectfully submitted,

BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com

Aaron M. Streett (TX Bar No. 24037561)
Harrison Reback (TX Bar No. 24012897)
(*pro hac vice*)
910 Louisiana Street
Houston, TX 77002-4995
Phone: (713) 229-1234
aaron.streett@bakerbotts.com
harrison.reback@bakerbotts.com

**CERIFICATE OF SERVICE**

I hereby certify that on this the 16th day of April 2024, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (D.C. Bar No. 1024647)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com
