UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

          *Plaintiffs*,

    v.

MICHAEL S. REGAN, *et al.*,

          *Defendants.*

Civil Action No. 21-119 (RDM)

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the motion of Defendant-Intervenors the State of Florida and the Florida Department of Environmental Protection (hereinafter "Florida") for a stay pending appeal.  Dkt. 187.  The Federal Defendants "take no position on Florida's motion," Dkt. 188 at 1, and Plaintiffs oppose the motion, Dkt. 189 at 9.  For the reasons explained below, the Court will **DENY** Florida's motion.

**I.**

Over the past two years, the Court has issued four decisions resolving all but one of Plaintiffs' claims in this case.  In March 2022, the Court ruled in favor of the Federal Defendants and Florida with respect to Count 9 of Plaintiffs' original complaint.  *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022) ("*CBD I*").  Then, in August 2023, the Court held that Count 8 of Plaintiffs' original complaint was non-redressable and, accordingly, dismissed that count for lack of Article III standing.  *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2023 WL 5437496 (D.D.C. Aug. 23, 2023) ("*CBD II*").  In February 2024, the Court issued a decision resolving all of Plaintiffs' claims under the Endangered Species Act

("ESA"), 16 U.S.C. § 1531 *et seq.*  Ruling in favor of Plaintiffs on Counts 3, 4, 6 and 10–13 of their amended complaint, Dkt. 77 (Am. Compl.), the Court set aside the U.S. Fish and Wildlife Service's ("FWS") programmatic Biological Opinion ("BiOp") and Incidental Take Statement ("ITS") and the Environmental Protection Agency's ("EPA") approval of Florida's Section 404 assumption application.  *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 655368 (D.D.C. Feb. 15, 2024), *amended by* ___ F. Supp. 3d ___, 2024 WL 1602457 (D.D.C. Apr. 12, 2024) ("*CBD III*").  Finally, on April 12, 2024, the Court dismissed Counts 1, 2 and 5 of the amended complaint on prudential mootness grounds.  *Ctr. for Biological Diversity v. Regan*, ___ F. Supp. 3d ___, 2024 WL 1591671 (D.D.C. Apr. 12, 2024) ("*CBD IV*").

After resolving all but one count of Plaintiffs' sprawling complaint, at Florida's request, the Court entered partial final judgment as to Counts 1–6 and 8–13 of the amended complaint, concluding that the parties should be permitted to appeal the Court's final decisions on those counts "without delay."  *Id.* at *12; Dkt. 184.  On April 15, 2024, Florida noticed its appeal, Dkt. 185, and, the following day, it filed the present motion, which asks the Court to stay its "vacatur order" pending appeal.[1]  Dkt. 187 at 1.  Because Florida requested a ruling on its motion by April 23, 2024, *id.* at 2, the Court directed "any party wishing to be heard on th[e] motion [to] file a response on or before April 22, 2024 at 3:00 p.m.," Min. Order (Apr. 17, 2024).

In response, the Federal Defendants filed a notice taking "no position on Florida's motion for a stay pending appeal," but observing that the U.S. Army Corps of Engineers ("Corps") is currently administering the Section 404 permitting program "in a way that serves the public" and

---

[1] As discussed further below, it is unclear whether Florida is seeking a stay of the Court's order vacating the EPA's approval of Florida's Section 404 assumption application or a stay of that order as well as a stay of the Court's order vacating the BiOp and ITS.  *See generally CBD III*, 2024 WL 1602457, at *43–45.

"is diligently processing permit applications and will continue to do so to mitigate any disruption and delay to applicants." Dkt. 188 at 1. Plaintiffs oppose Florida's motion for a stay pending appeal, arguing that a stay would create regulatory uncertainty by allowing Florida to "issue permits pursuant to a program already found to be unlawful, creating questions about the legality of those permits, any incidental take they may purportedly authorize, and any exemption from liability for incidental take that the program might purport to ensure." Dkt. 189 at 6.

## II.

To obtain the relief it seeks, Florida bears the burden of satisfying "the stringent requirements for a stay pending appeal." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1016 (D.C. Cir. 2018); *Archdiocese of Wash. v. WMATA*, 877 F.3d 1066, 1066 (D.C. Cir. 2017). In deciding whether to grant a stay, the Court must consider four factors: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits;" (2) "whether the applicant will be irreparably injured absent a stay;" (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). As the Supreme Court has observed, "[t]here is substantial overlap between these [factors] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "The first two factors of the traditional standard are the most critical," and they require, respectively, "'[m]ore than a mere 'possibility' of relief'" and more than "some 'possibility of irreparable injury.'" *Id.* (internal citations omitted).

As an initial matter, Florida submits that the "sliding-scale" approach applies here. Under that approach, Florida argues, it need establish only "a serious legal question on the merits" at the first step, and, (conversely) if it "can demonstrate probable success on the merits," then it need establish only "a possibility of irreparable injury" at the second step.  Dkt. 187 at 3, 11 (internal citations and quotation marks omitted).  Florida is correct that prior to the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the D.C. Circuit applied a "sliding-scale" approach, under which "a strong showing on one factor could make up for a weaker showing on another."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, however, the D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93); *see also Archdiocese of Wash v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (suggesting that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").  "[I]t remains an open question," however, "whether the 'likelihood of success' factor is an 'independent, free-standing requirement,' or whether, in cases where the three other factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 393, 398).

Despite this uncertainty, two propositions are settled.  First, *Winter* leaves no doubt that a mere "possibility" of irreparable injury is not enough, regardless of the movant's likelihood of success on the merits.  555 U.S. at 22.  As the Supreme Court explained, "[i]ssuing a preliminary

4

injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* In short, "a showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted). That same principle also applies to stays pending appeal. *See Nken*, 556 U.S. at 434 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." (internal citation and quotation marks omitted)). Second, even if the sliding-scale approach *did* apply to irreparable injury, double dipping—or double sliding—is not allowed: that is, a movant cannot argue at the likelihood-of-success-on-the-merits step that a "serious legal question" suffices, and then argue at the irreparable-injury step that a "possibility of irreparable injury" also suffices. *Contra* Dkt. 187 at 3, 11.

For present purposes, however, none of this matters, because Florida has failed to carry its burden with respect to any of the four factors, even assuming that the sliding-scale approach still applies.

### III.

Although Florida asserts in conclusory terms that it has a "substantial likelihood of success" on the merits, Dkt. 187 at 4, most—if not all—of its argument seeks to clear the lower hurdle of showing that its appeal raises a "serious legal question," *id.* at 4–9. Florida's argument is based almost entirely on this Court's disagreement with the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018). But Florida's argument fails to address other portions of the Court's opinion, which explain in detail why the BiOp and ITS at issue in this case failed to comply with ESA and its governing regulations. *See*

*CBD III*, 2024 WL 1602457, at \*25–29, \*32–34.  To take one example, the regulations provide that a BiOp "shall include" a "detailed discussion of the environmental baseline of the listed species" and a "detailed discussion of the effects of the action on listed species," 50 C.F.R. § 402.14(h), yet the BiOp at issue here failed to include "*any* species-specific analysis," *CBD III*, 2024 WL 1602457, at \*26 (emphasis in original).  Or, to take another example, "the regulations unambiguously require that [an ITS] set 'a clear standard for determining when the level of anticipated take has been exceeded,'" yet the ITS at issue here "omit[ted] this essential term." *Id.* at \*33 (quoting 50 C.F.R. § 402.14(i)(1)(i)).

Moreover, although Florida focuses on the differences between the Court's opinion and the Second Circuit's opinion in *Cooling Water*, it never explains why this Court's analysis is wrong—or even subject to serious dispute.  As the Court observed in *CBD III*, the Second Circuit's analysis of the programmatic BiOp and ITS before it came down to a single paragraph in the decision.  In that paragraph, the court cited the Eleventh Circuit's decision in *Defenders of Wildlife v. U.S. Department of the Navy*, 733 F.3d 1106 (11th Cir. 2013), for the following proposition:  "'[T]he rule that biological opinions must be coextensive in scope with the entire action or else violate the ESA is nowhere to be found in the language of the ESA.'"  *CBD III*, 2024 WL 1602457, at \*30 (quoting *Cooling Water*, 905 F.3d at 73, quoting in turn *Defs. of Wildlife*, 733 F.3d at 1121).  But, as this Court explained, *Defenders of Wildlife* does not stand for the proposition that the FWS may, at times, ignore the requirement of preparing a legally sufficient BiOp—instead, that court merely held that the National Marine Fisheries Service (the FWS's marine counterpart) may address species-specific effects in phases, as a federal project moves from planning to implementation.  *Id.*; *see also North Slope Borough v. Andrus*, 642 F.2d 589, 593 (D.C. Cir. 1980).  That phased approach differs markedly from the present context,

where the BiOp and ITS at issue purported to extend ESA liability protection to all future

Section 404 permittees in Florida, without *ever* conducting *any* species-specific analysis or

including *any* numerical take limits (or surrogates) in the ITS.  As the Court explained, "the ESA

does not permit an agency to bypass the Section 7 consultative process altogether by postponing

the required, 'detailed discussion of the effects of the action on listed species,' 50 C.F.R.

§ 402.14(g), to a later phase, only to conclude" "that the later phase involves state, rather than

federal, action and thus lies beyond the reach of Section 7."  *CBD III*, 2024 WL 16022457, at

*30.

The Court's conclusion followed from the statutory text and implementing regulations.

*See id.* at *31.  The Court will not repeat its analysis here but notes that the regulations define

"programmatic consultation" and "framework programmatic action" in a manner that permits

phased review but that leaves little doubt that the FWS (or the National Marine Fisheries

Service) will engage in the required species-specific analysis at some point down the line.  *Id.*

Under Florida's reading of the law, in contrast, the core requirements of liability protection under

the ESA—that the FWS prepare a detailed BiOp containing the required species-specific

analyses and that it issue an ITS containing numerical take limits or their surrogates—can be

replaced with a non-statutory, non-regulatory "technical assistance" process.  That might (or

might not) make policy sense.  But it is not the law that Congress enacted or that the relevant

agencies included in the implementing regulations.  In seeking a stay, Florida never explains why

any of the above-described analysis—or any of the other analysis contained in *CBD III*—is

incorrect.

As a fallback, Florida argues that it is likely to prevail by showing that Plaintiffs lack

standing—or at least that their standing "raises serious legal questions."  Dkt. 187 at 9–10.

Notably, the Federal Defendants have never questioned Plaintiffs' standing, and, in the most
recent round of briefing, Florida pressed only a narrow challenge to Plaintiffs' standing.  *See
CBD III*, 2024 WL 1602457, at *17.  For present purposes, apart from referencing its prior
arguments, Florida simply asserts that the "Court erroneously based standing injury on facts
arising after the complaint was filed."  Dkt. 187 at 10.  In pressing that argument, however,
Florida ignores the very next paragraph of the Court's opinion, which points to independent
grounds to support Plaintiffs' standing, and Florida ignores the fact that the Plaintiffs'
declarations—which were properly offered at the summary judgment stage—merely responded
to Florida's own contention that it was administering the Section 404 program in a manner that
accorded Plaintiffs all the protection that they would otherwise have received under federal law.
*CBD III*, 2024 WL 1602457, at *19–20.

Finally, Florida argues that the Court's decision to set aside the Section 404 assumption
decision, rather than remanding without vacatur, "raises serious legal questions."  Dkt. 187 at 10.
But that argument ignores the plain language of the APA, which treats vacatur as the
presumptive or "normal" remedy, *see Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518
(D.C. Cir. 2020); it ignores D.C. Circuit precedent holding that "remand without vacatur remains
an exceptional remedy," *id.* at 519; and, beyond observing that the Court gave serious
consideration to whether to limit its vacatur to the BiOp and ITS, it offers no reason to question
the Court's ruling, Dkt. 187 at 10.  Even more importantly, it ignores the Court's decision in
*CBD IV*, which provides ample reason to conclude that vacating the BiOp and the ITS, but not
vacating the Section 404 assumption decision, would invite confusion and inefficiency and
would do little, if anything, to preserve the program.  *See* 2024 WL 1591671, at *3–4.

For all of these reasons, the Court concludes that Florida has failed to identify any theory of appeal on which it is likely to prevail or that even raises a serious legal question.

**IV.**

Florida has also failed to demonstrate that it is likely to suffer an irreparable injury if the Court declines to grant a stay. As explained above, irreparable injury is the *sine qua non* for injunctive relief and for a stay pending appeal. *See Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 167. Here, however, the federal agencies that issued the BiOp and the ITS and that approved Florida's Section 404 assumption application represent that the Corps is ready, willing, and able to administer the Section 404 permitting program in Florida during the pendency of an appeal—as the Corps did for decades before Florida's assumption application was approved and as it does in 47 other States. The further representations that the Federal Defendants made for purposes of *CBD IV* bear repeating here:

> [A]s of February 15, there were about 1,000 permit applications pending before the State of Florida. The Corps has identified and allocated resources to process those permits. And it starts with the Jacksonville District of the Corps, which is the office that has hand[l]ed Section 404 permitting in Florida since forever, pre-assumption . . . . [T]here are more people in the Jacksonville district today to process [S]ection 404 permits than there were before state assumption. And it is not just a couple more, it is a couple dozen more. In addition to the Jacksonville district, there are four other districts within the South Atlantic division. And the Corps has identified people in the other districts and the South Atlantic division as well as [at] Corps headquarters who can help with the anticipated surge of permits given the number of permits that were pending before Florida.
>
> And I say the anticipated surge, Your Honor, because Florida has not transferred permits to the Corps yet. The Corps is prepared to process those permits. But if those permits exist in a state of regulatory limbo today, I want the Court to understand it is not because the Corps has not taken steps to comply with the Court's Order of February 15th. The Corps is ready to process permits.
>
> Now, notwithstanding the fact that we haven't gotten permits from Florida yet. We have had meetings at the Corps with quite a few project proponents, including project proponents who have permits that were pending before Florida

> as of February 15th.  And a number of those entities have congressionally approved agreements with the Corps to seek expedited Corps review of Section 404 permit applications for priority projects.

2024 WL 1591671, at *5 (quoting Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.)).  Against this backdrop, Florida offers three arguments in support of its claim of irreparable injury, none of which is persuasive.

First, Florida argues that a stay is required to prevent "irreparable harm to [its] sovereign interests in the conservation and management of water resources and wildlife," which are "both areas of traditional state responsibility."  Dkt. 187 at 11.  But that overstates the State's interest in administering the Section 404 permitting program pursuant to the Clean Water Act.  To be sure, Section 404 of the Clean Water Act, 33 U.S.C. § 1344(g), recognizes that some states may have an interest in administering their "own individual and general permit program[s] for the discharge of dredged or fill material into the navigable waters" of the United States, and it provides a process by which a State may assume the Section 404 permitting authority typically exercised at the federal level by the Corps.  *See also id.* § 1251(b) ("It is the policy of Congress that the States . . . implement the permit programs under sections 1342 and 1344 of this title.").  But the Clean Water Act is a federal statute that protects the navigable waters of the United States.  *See Sackett v. EPA*, 598 U.S. 651, 671 (2023).  In the words of the Supreme Court, it is "the principal federal law regulating water pollution in the United States."  *Id.* at 657–58.  Regardless of whether Florida is authorized to implement that *federal* law with respect to the navigable waters of the United States, it remains free to enforce *state* law and to exercise its traditional sovereign authority to prevent pollution and other environmental harms in the State.  *See, e.g.*, Fla. Stat. § 403.161(1); *id.* § 403.121.  Indeed, as Florida stressed when it filed its Section 404 assumption application, it "administers the comprehensive state Environmental

10

Resource Permitting (ERP) program, which includes permitting dredge and fill activities" and "overlap[s] with the federal Clean Water Act (CWA) Section 404 permitting program approximately 85%." Dkt. 55 at 501. Nothing that the Court has decided curtails in any manner the State's authority to exercise this traditional sovereign authority. In the State's view, it would promote efficiency for a single regulator to administer the federal and state permitting programs—but that is a question of efficiency, not sovereignty.

Second, Florida argues that a stay is necessary to ensure that it has "authority to enforce the [Section] 404 program for all" permits that it has already issued. Dkt. 187 at 12. That, again, raises (at most) an efficiency concern and does not constitute the type of "certain and great" injury necessary to support a stay. *Chaplaincy of Full Gospel Church v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Nor is it even clear that a stay is necessary to promote efficiency in the enforcement of Section 404, since the Corps is currently administering the Section 404 program—as it did before assumption, as it would do in the case of a withdrawal of assumption approval, *see* 33 U.S.C. § 1344(i), and as it does in 47 other States—and it is fully capable of enforcing Section 404 during the pendency of Florida's appeal.

Third, Florida argues that it will suffer irreparable injury in the absence of a stay because "over 1,000 permit applications were pending in the [state Section] 404 process and as a result of the vacatur order these projects face delay, regulatory limbo and/or will be forced to start their [Section] 404 application process essentially from 'square one' with the Corps." Dkt. 187 at 13. But the Federal Defendants have represented to the Court that the Corps will move expeditiously to process the pending applications; that "a project will not go to the back of the line just because the applicant had previously applied to Florida;" and that, "as much as possible," the Corps

11

intends to "pick up where Florida left off, to the extent that the information submitted to Florida satisfies the Corps' requirements." *See* Dkt. 181 at 30–31 (Apr. 4, 2024 Hrg. Tr.). Notably, counsel for the Federal Defendants specifically addressed Florida's "square one" argument in the context of *CBD IV*: The "Corps' intention here is not to make people start from square one" but, rather, "to do this as efficiently as possible. *Id.* at 31 (Apr. 2, 2024 Hrg. Tr.).

Finally, Florida argues (1) that a stay is required because the State has "expended substantial resources applying for and obtaining approval of its [Section] 404 program application" and in "staffing, organizing, and implementing the . . . program," and (2) that permitting the Court's vacatur order to stand would "eliminate[] critical efficiencies gained in the [Section] 404 permitting process in Florida." Dkt. 187 at 14. It goes without saying that a stay would do nothing to make Florida whole for its past expenditures and that neither the loss of the benefit that Florida anticipated achieving based on those expenditures nor the efficiencies that it hopes to bestow on future Section 404 permit applicants constitutes "certain and great" harm necessary to support emergency relief. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. It is well settled that neither the "expense" nor the "annoyance of litigation . . . constitute[s] irreparable injury," *United States v. Facebook, Inc.*, 2024 U.S. App. LEXIS 5979, at *2 (D.C. Cir. Mar. 12, 2024) (per curiam), and it follows with even greater force that past expenditures pursuing an application before an administrative agency do not support the issuance of prospective, emergency relief.

The Court, accordingly, concludes that Florida has failed to demonstrate that it is likely to suffer irreparable harm if the Court's vacatur order is not stayed pending appeal.

**V.**

With respect to the final two factors, the risk of injury to Plaintiffs and the public interest, Florida reprises many of the arguments discussed above.  In particular, it argues that the public interest is and will continue to be jeopardized by (1) the delays and disruption faced by permit applicants forced to "return to square one by refiling their applications with the Corps;" (2) the absence of State Section 404 enforcement authority in the waters of the United States; and (3) the harm to "Florida's sovereign interests in the management and conservation of water resources and wildlife in the state, all of which fall squarely in the traditional authority of the states, not the federal government."  Dkt. 187 at 15.  Those arguments are unpersuasive for the same reasons explained above.  *See also, e.g.*, Dkt. 188 at 1; Dkt. 181 at 28–31 (Apr. 4, 2024 Hrg. Tr.).

Finally, the Court notes that it is unclear whether Florida seeks to stay the Court's vacatur of the EPA's Section 404 assumption decision alone or whether it also seeks to stay the Court's vacatur of the FWS's programmatic BiOp and ITS.  *But see* Dkt. 187 at 1 (requesting that the Court stay its "order vacating the Environmental Protection Agency's . . . approval of Florida's Clean Water Act . . . Section 404 assumption application").  That distinction matters.  As explained in *CBD IV*, it is far from clear that leaving Florida with Section 404 permitting authority in the absence of incidental take protection for Florida's developers would serve anyone's interests.  2024 WL 1591671 at *4.  Among other things, few developers would "risk civil and criminal penalties" by engaging in conduct likely to affect listed species without first obtaining incidental take protection.  *Me. Lobstermen's Assoc. v. NMFS*, 70 F.4th 582, 593 (D.C. Cir. 2023).  But, on the other hand, an order staying the Court's vacatur of the FWS's ITS would have significant repercussions, affecting interests well beyond those identified in Florida's motion.  For example, as Plaintiffs point out, the Court denied as moot the motion for a

temporary restraining order and preliminary injunction, Dkt. 135, which sought to enjoin two

permits from issuing that the Center for Biological Diversity and the Sierra Club argued would

cause irreparable harm to the critically endangered Florida panther and threatened crested

caracara.  Dkt. 189 at 32.[2]  Having decided the merits of Plaintiffs' summary judgment motion,

the Court had no occasion to reach Plaintiffs' motion for a preliminary injunction.  *See CBD III*,

2024 WL 1602457, at *45.  But were the Court to stay its decision pending appeal, the Court

would, in effect, deny Plaintiffs the preliminary relief that they sought, notwithstanding their

likelihood (indeed, certainty) of success on the merits and without ever reaching their claim of

irreparable harm.

The Court, accordingly, concludes that factors three and four also weigh against issuing a

stay pending appeal.

### CONCLUSION

On a motion for a stay, "it is the movant's obligation to justify the [C]ourt's exercise of

such an extraordinary remedy."  *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978

(D.C. Cir. 1985).  Florida has failed to carry that heavy burden here.  Accordingly, Florida's

motion for a stay pending appeal, Dkt. 187, is hereby **DENIED**.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  April 23, 2024

---

[2] The motion for a temporary restraining order and preliminary injunction, Dkt. 135, was filed by two of the plaintiffs in this case, the Center for Biological Diversity and the Sierra Club.